**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------x
                                        :
In re:                                  :  Chapter 11
                                        :
DEVONSHIRE PGA HOLDINGS, LLC,           :  Case No. 13-12460 (_____)
et al.,¹                                :
                                        :  (Joint Administration Pending)
Debtors.                                :
                                        x
-----------------------------------------------------------
```

**DECLARATION OF PAUL RUNDELL IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Paul Rundell, being duly sworn, deposes and says:

1.      I am the Chief Restructuring Officer ("CRO") of Devonshire PGA Holdings, LLC, Devonshire at PGA National, LLC, Chatsworth at PGA National, LLC and Chatsworth PGA Properties, LLC (collectively, the "Debtors"), the above-captioned debtors and debtors in possession.

2.      I am also a Managing Director of Alvarez & Marsal in its Healthcare Industry Group in Chicago, Illinois.  I have more than fifteen (15) years of experience, specializing in interim management, with a focus on cash management and financial analysis.  I have provided cash management, financial support, crisis management, turnaround consulting, business strategy and planning, market analysis and operational improvement services to clients, and I have advised unsecured and secured creditors and debtors both in and out of court.

3.      In my capacity as CRO, I have personal knowledge of, and am familiar with, the

---

¹  The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Devonshire PGA Holdings, LLC (2843) ("Holdings"), Devonshire at PGA National, LLC (2904) ("Devonshire"), Chatsworth at PGA National, LLC (3412) ("Chatsworth National") and Chatsworth PGA Properties, LLC (3472) ("Chatsworth Properties", together with Devonshire and Chatsworth National, the "Operating Debtors").  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 350 Devonshire Way, Palm Beach Garden, FL 33418.

business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this Declaration on behalf of the Debtors.

4.      On September 19, 2013 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

5.      The Debtors remain in possession of their assets and continue to manage their business as debtors in possession permitted by Bankruptcy Code Sections 1107 and 1108.

6.      No trustee, examiner, or committee has yet been appointed in these cases.

7.      The Debtors have filed or anticipate filing the following motions and applications (collectively, the "First Day Motions"):

(a)     Debtors' Motion for Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (I) Directing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes (the "Joint Administration Motion");

(b)     Motion of Debtors for Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Administrative Agent and (III) Scheduling A Final Hearing (the "Cash Collateral Motion");

(c)     Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363, 507(a), 541, 1107(a) and 1108 and Bankruptcy Rule 6003 Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits (the "Wage Motion");

(d)     Debtors' Motion for Order Under Bankruptcy Code Sections 105(a) and 366 (I) Approving Debtors' Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment, and (III) Scheduling a Hearing with Respect to Contested Adequate Assurance of Payment Requests (the "Utilities Motion");

(e)    Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363, and 364, Fed. R. Bankr. P. 6003 and Del. Bankr. L.R. 2015-2 (I) Authorizing Maintenance of Existing Bank Accounts, (II) Authorizing Use of Existing Business Forms, and (III) Authorizing Use of Existing Cash Management System (the "<u>Cash Management Motion</u>"); and

(f)    Application Pursuant to 11 U.S.C. §§ 521, 28 U.S.C. § 156(C) and Rule 2002 of the Federal Rules of Bankruptcy Procedure for an Order: (A) Authorizing the Debtor to Mail All Notices; and (B) Approving the Form of Agreement with Epiq Systems as Claims, Noticing, and Solicitation Agent of the Bankruptcy Court ("<u>Claims Agent Application</u>").

8.    The Debtors further anticipate filing a proposed Chapter 11 Plan of Reorganization (the "<u>Plan</u>") and associated Disclosure Statement (the "<u>Disclosure Statement</u>") concurrently with or shortly following the filing of these cases. Additionally, the Debtors anticipate filing (i) a motion to authorize the Debtors to maintain certain escrow arrangements with respect to entrance fees, (ii) a motion to permit the Debtors to self-report in lieu of the Bankruptcy Court appointing a patient care ombudsman and (iii) a motion authorizing the Debtors to reject management agreements between (x) Chatsworth at PGA National, LLC and SHP Health Care Services, LLC and (y) Devonshire at PGA National, LLC and SHP Senior Living Services, LLC.

9.    The Debtors also anticipate filing an adversary proceeding to compel the turnover of books and records and to gain access to their properties pursuant to Bankruptcy Code Section 542.

10.    I am submitting this Declaration in support of the Debtors' First Day Motions. Capitalized terms used but not defined in this Declaration shall have the meanings set forth in the relevant First Day Motion. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, employees or other representatives of the

Debtors.  If I were called as a witness, I would testify consistently with the facts set forth in this Declaration.

11.    This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these Chapter 11 cases.  Section I provides an overview of the Debtors' operations.  Section II recounts the events preceding the bankruptcy filings.  Section III affirms and incorporates facts that support the First Day Motions.

## PRELIMINARY STATEMENT

12.    These Chapter 11 cases are intended to implement a consensual restructuring that has been fully negotiated by the Debtors, their Senior Lender, ELP West Palm ("ELP"), and Trimont Real Estate Services, Inc. as Administrative Agent ("Trimont"), the terms of which are set forth in the Restructuring, Lockup and Plan Support Agreement, dated September 17, 2013, a copy of which is attached hereto as Exhibit A (the "Plan Support Agreement"), by which the parties agreed to support a plan.  The transactions contemplated by the Plan Support Agreement are embodied in the Plan.  The terms of the Debtors' restructuring, as set forth in the Plan, ensure that the rights of the Debtor's residents and its general unsecured creditors will not be affected. Accordingly, the Debtors do not anticipate that these cases will be contentious and seek the Court's assistance in providing for an expeditious exit from Chapter 11 protection.

I.    **Overview of the Debtor's Business**

A.    **Description of Debtors' Continuing Care Retirement Communities.**

13.    The Debtors have owned The Devonshire at PGA National (the "Facility"), a for-profit continuing-care retirement community located in Palm Beach Gardens, Florida, since 2007.  The Facility is comprised of two components (1) an independent living facility with 327 independent living units consisting of three 4-story residential towers all connected to a central clubhouse (the "Independent Living Facility") and (2) an assisted living and skilled nursing

facility with a total of 110 units (34 assisted living units and 76 skilled nursing units), a number of which are also designated as Alzheimer's/dementia care units (the "Chatsworth Medical Facility").

14.     The Facility is a residential alternative for older adults (generally age 65 and older) that provides flexible housing options, a coordinated system of services and amenities, and a continuum of care that addresses the varying health and wellness needs of residents as they grow older.  The Facility enables residents to remain in the same community and avoid having to move—except, perhaps, to another level of care within the community—if their needs change and they require additional health care and supervision.  Remaining within the Facility allows the residents to continue their existing personal relationships; avoid the stress of a move; and receive health care, should it be needed, in a familiar environment.

**B.      Organizational Structure of the Debtors.**

15.     Devonshire is wholly-owned by Holdings.  Devonshire, in turn, in addition to owning and operating the Independent Living Facility, wholly owns both Chatsworth at PGA, which provides the skilled nursing care to residents of the Chatsworth Medical Facility, and Chatsworth Properties, which owns property on which the Chatsworth Medical Facility is located.  A chart demonstrating the corporate structure of the Debtors is below:



C.      **Residents.**

16.     The Facility operates as an entrance fee continuing care retirement community that utilizes a "Type A" residency agreement under which independent living residents pay a one-time entrance fee and a monthly service fee to reside at the Facility.  In exchange for the one-time entrance fee, the resident has the exclusive right to occupy and use a specified "living accommodation" in the development.  Independent living residents at the Facility can choose from three Residency Contracts, which provide for either 0%, 50% or 90% refundability of the entrance fees.  Independent living residents also have priority access to the assisted living, Alzheimer's and skilled nursing units located at the Chatsworth Medical Facility, although a separate health center admission agreement is required.

D.      **Management of the Facility.**

17.     The business operations of the Facility are currently managed by two management companies wholly-owned by Craig Anderson, the former principal of the Debtors.  The business operations of Devonshire are currently managed by SHP Senior Living Services, LLC ("SHP Senior Living") and the business operations of Chatsworth at PGA are managed by SHP Health Care Services, LLC ("SHP Health Care" and together the "SHP Property Managers")  under two separate agreements (the "Services Agreements").  On or about September 19, 2013, the Debtors filed a motion to reject the Services Agreement.

18.     Under the Services Agreements, the SHP Property Managers manage the Facility in the name of and for the respective Debtors, including but not limited to, managing the day-to-day operations, preparation of and compliance with budgets, managing a separate "Staffing Company" concerning the hiring and firing of employees, and other matters as set forth in the Services Agreements.

19.     The Services Agreement requires payment of a management fee on a monthly

basis based on the operation of (i) $60,587, adjusted annually by a defined consumer price index or (ii) five percent of defined "Facility Revenue."  Payment of the services fee during an event of default is reduced and limited by the terms of the Conditional Assignments of Management Agreements, entered into for the benefit of the lenders under the ELP Credit Agreement (as defined below).

**E.    Regulatory Agencies.**

20.    The continuing care retirement community industry nation-wide is heavily-regulated by various state and federal agencies.  Each state has a different regulatory regime in this area, particularly with respect to disclosure of financial statements, solvency of the facility, maintenance of a certain amount of reserves, and the refunding of fees and deposits.  As a continuing care retirement community operating in the State of Florida, the Debtors receive regulatory oversight jointly from the Florida Office of Insurance Regulation ("OIR") and the Florida Agency for Health Care Administration ("AHCA").  The Devonshire currently holds a Certificate of Authority issued by the OIR.  The Chatsworth at PGA currently holds a Nursing Home License (License No. 130471003) issued by the AHCA and an Assisted Living Facility License (License No. 9586) issued by AHCA.

**F.    Debtors' Prepetition Capital Structure**.

ELP Credit Agreement

21.    On or about May 1, 2007, the Operating Debtors entered into a Credit and Security Agreement with Merrill Lynch Capital ("Merrill Lynch"), as amended (the "ELP Credit Agreement"), pursuant to which a loan was advanced in the stated principal sum of $161,620,000 which was subsequently transferred to ELP (the "ELP Loan").  Merrill Lynch served as the initial Administrative Agent of the ELP Loan.  On February 4, 2008, Merrill Lynch was acquired by GE Business Financial Services, Inc. ("GE"), after which GE became

Administrative Agent of the ELP Loan.  On October 7, 2011, GE Resigned as Administrative

Agent.  Trimont was appointed the successor Administrative Agent in April, 2012.

22.    The ELP Loan consists of (a) a Term Note (Note A), dated May 1, 2007, in the

principal sum of $75,000,000, (b) a Term Note, dated May 1, 2007, in the principal sum of

$40,000,000, which, in or about August, 2007, was subsequently amended and restated into two

separate promissory notes, an Amended and Restated Term Note (Note B-1) in the original

principal amount of $20,000,000 and an Amended and Restated Term Note (Note B-2) in the

original principal amount of $20,000,000, and (c) a Term Note (Note C), dated on or about May

1, 2007, in the original principal sum of $40,220,000 (all of which are collectively referred to as

the "Notes").  On or about July 24, 2013, ELP became the sole holder of the Notes and sole

lender under the ELP Credit Agreement.

23.    The ELP Credit Agreement is secured by a first priority Lien on and security

interest in, all right, title and interest in any and all property and interests in property of the

Operating Debtors, all as more fully set forth in the ELP Credit Agreement.  The ELP Loan is

also secured by, among other things, a Mortgage, Assignment of Leases and Rents, Security

Agreement and Fixture Filing (the "Mortgage") executed by Devonshire and Chatsworth

Properties and delivered to Merrill Lynch, as Administrative Agent.  The Mortgage was recorded

on May 2, 2007 in Official Record Book 21689 at Page 872 of the public records of Palm Beach

County, Florida.  Devonshire and Chatsworth Properties also executed an Assignment of Leases

and Rents, which was recorded on May 2, 2007 in Official Record Book 21689, Page 0897 of the

public records of Palm Beach County, Florida.

24.    The Operating Debtors are in default of the obligations under the ELP Credit

Agreement, the ELP Loan and the Mortgage by, among other things, failing to pay all amounts

due and owing by the maturity date of April 30, 2012.  As of the Maturity Date, the Operating

Debtors jointly and severally owe the aggregate principal sum of $158,193,915.93, together with

interest of $236,946.39, with interest thereafter accruing at the default rate set forth in applicable

documents.

<u>Mezzanine Credit Agreement</u>

25.      On or about May 1, 2007, Holdings entered into a Credit and Security Agreement

with Merrill Lynch Capital, as amended (the "<u>Mezzanine Credit Agreement</u>"), pursuant to which

a loan was advanced in the stated principal sum of $19,625,000 (the "Mezz Loan").  The Mezz

Loan is evidenced by that certain Mezzanine Promissory Note, dated as of May 1, 2007.

Following a series of assignments, HJSI-II, LLC became the sole lender under the Mezzanine

Credit Agreement on or about April 2013.

26.      The Mezzanine Credit Agreement and the obligations thereunder are secured by a

continuing first priority Lien on and security interest in, all right, title and interest in and to any

and all property and interest in property of Holdings, all as more fully set forth in the Mezzanine

Credit Agreement.  As additional security for the Mezz Loan, SHP Senior Living Investments,

LLC (Holdings' sole member, "<u>SHP</u>"), entered into that certain Ownership Pledge, Assignment

and Security Agreement dated May 1, 2007 with Merrill Lynch, as lender and administrative

agent (the "<u>SHP Pledge Agreement</u>").   Under the SHP Pledge Agreement, SHP pledged,

assigned and granted to the administrative agent, for the benefit of the Mezzanine Lender (as

defined in the SHP Pledge Agreement) and administrative agent, a security interest in the

Collateral (as defined in the SHP Pledge Agreement), and which includes, among other things,

all of the stock, shares, membership interests, partnership interests and other equity ownership

interests in Holdings now or hereafter held by SHP (collectively, the "<u>Ownership Interests</u>") and

all rights privileges, authority and powers of SHP as owner or holder of tis Ownership Interests, all as more fully set forth in the SHP Pledge Agreement.

27.     Holdings is in default of the obligations under the Mezzanine Credit Agreement by, among other things, failing to pay all amounts due and owing by the maturity date of April 30, 2012.    As of September 11, 2013, Holdings owed the aggregate principal sum of $20,156,718, with interest thereafter accruing at the default rate set forth in applicable documents.

28.     As stated below, on September 12, 2013, a foreclosure sale was held on the rights under the SHP Pledge Agreement.  Pursuant to that foreclosure HJSI-II, the Mezzanine Lender became the sole member of Holdings.

**G.     Florida Foreclosure Action**.

29.     On August 8, 2012, TriMont, as Administrative Agent, commenced a foreclosure action in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida (Case No.: 50 2012 CA 014613 XX XX MB AE, the "Florida Foreclosure Action") against the Operating Debtors for the benefit of the lenders under the ELP Credit Agreement seeking foreclosure of the real property and damages.

30.     On May 1, 2013, TriMont filed a second amended complaint, which alleges causes of action for Foreclosure of Mortgage (Count I), Foreclosure of Security Interest (Count II), Breach of Promissory Note (Note A) (Count III), Breach of Amended and Restated Promissory Note (Note B-1) (Count IV), Breach of Amended and Restated Promissory Note (Note B-2) (Count V), Breach of Promissory Note (Note C) (Count VI) and Breach of Guaranty (Count VII).

31.     In response, the Operating Debtors[2] filed their Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint and Counterclaims.   All previous lenders involved with the ELP Loan were named as counterclaim defendants, including, Trimont, Devonshire Funding Company, Inc., Redwood Capital Investments, LLC, Devonshire Campus, LLC, Capmark Bank, Capmark Finance, LLC, GE, S-Devonshire, LLC, S-1 Devonshire, LLC, and Landesband Baden-Württemberg.   At this time, the Florida Foreclosure Action is still pending. On the Effective Date of the Plan, the Debtors and ELP will seek dismissal of the Florida Foreclosure Action and all counterclaims.

**H.      UCC Auction of Mezzanine Interests**.

32.     Following the stated maturity date of the Mezzanine Credit Agreement, on or about May 9, 2012, HJSI Devonshire, LLC, as Administrative Agent under the Mezzanine Credit Agreement ("HJSI") sent notice of the default to Devonshire.  On or about July 29, 2013, HJSI-II sent notice to SHP and other parties of its intent to sell the Collateral owned by SHP, and pledged to HJSI-II, to the highest qualified bidder through a public auction to be held on September 12, 2013 (the "Auction") in accordance with the Uniform Commercial Code.  On or about August 19, 2013, a separate notice was sent to SHP's principal and a co-obligor under the Mezzanine Credit Agreement, Craig Anderson, regarding the Auction.

33.     Cain Brothers, a leading investment banking firm that focuses exclusively on the health care industry, directed the marketing process with respect to the Auction.  The process included, among other things, the publication of the notice of sale in both the Wall Street Journal (Florida edition) and the Palm Beach Post, as well as the preparation and circulation of a "teaser" regarding the Auction and the assets which were being sold, to over 55 potential strategic and

---

[2]   At the time the Answer was filed the Operating Debtors were controlled by SHP Senior Living Investments, LLC.

qualified institutional investors.

34.     A few days prior to the Auction, on, September 6, 2013, SHP filed a complaint in Connecticut Superior Court seeking to temporarily and permanently restrain HJSI and HJSI II from proceeding with the Auction (Docket. No. FBT-CV-13-6037755-S).   Following oral arguments, the court denied the temporary relief requested by SHP and allowed the Auction to proceed on September 12, 2013.

35.     At the Auction HJSI, as Administrative Agent on behalf of HJSI-II credit bid in the amount of $17,125,000 and was the successful bidder at the Auction, as no other bids were submitted.  Craig Anderson attended the Auction on behalf of SHP.  At the conclusion of the Auction, the HJSI requested that Mr. Anderson execute certain transfer documents as required under the SHP Pledge Agreement in order to effectuate the sale of the Collateral, including the 100% membership interests in Holdings, to HJSI.  Mr. Anderson refused to execute any such transfer documents.  As a result, HJSI, as attorney-in-fact for SHP, executed the necessary documents.

36.     Subsequent to the Auction, HJSI transferred the Collateral purchased at the Auction to HJSI-II, which remains the holder of the 100% ownership interests in Holdings.  As of September 17, 2013, the amount of $3,171,158.87 remains outstanding under the Mezzanine Credit Agreement and those other certain instruments, documents and agreements executed in connection therewith.

37.     On Monday, September 16, 2013, HJSI-II as the rightful member and equity interest holder in Holdings requested access to the book, records and property of the Debtors. Craig Anderson refused to provide such access.

## II.    Events Leading to Chapter 11

38.    Following the 2008 economic downturn and corresponding real estate market decline, large numbers of homeowners were (and continue to be) unable to sell their homes without a substantial loss in value.  Seniors interested in moving to a continuing care retirement community typically sell their existing homes and use the positive equity to fund the required entrance deposit.  Furthermore, the decline in the financial markets has resulted in many seniors having substantially smaller retirement savings than they had originally anticipated.  The severe and protracted real estate market downturn resulted in a drastic and proportional decline in the ability of many communities, including the Facility, to sell units to prospective residents.  Accordingly, although the Facility is fully operational, the housing market has limited its ability to achieve a stabilized occupancy rate in the independent living sections of the Facility.  As occupancy is the foundation of the Facility's business, its inability to achieve stabilized occupancy eventually resulted in an inability to refinance or repay in cash its obligations under the ELP Credit Agreement or Mezzanine Credit Agreement that became due on April 30, 2012.

39.    As described above, due to Holdings' inability to repay its obligations under the Mezzanine Credit Agreement, HJSI-II foreclosed on and purchased 100% of the membership interests in Holdings that were pledged to it by SHP.  Thus, HJSI-II controls, directly and/or indirectly, each of the Debtors in these Chapter 11 Cases.

40.    Accordingly, prior to filing these cases, HJSI-II, on behalf of each of the Debtors, engaged in extensive negotiations with ELP. Thereafter, the Debtors and ELP negotiated a restructuring of the Debtors secured and certain unsecured obligations, which is embodied in the Plan.  On September 17, 2013, the Debtors and ELP entered into the Plan Support Agreement that provides for ELP to support the Debtors' proposed Plan.  Further, as part of the negotiation

among the parties, and in order to facilitate the restructuring of the Debtors' indebtedness, ELP has agreed to contribute funds to be for Distributions under the Plan.  Because of Craig Anderson's refusal to permit the Debtors access to their books, records or properties, the Debtors had difficulty in preparing the First Day Motions.  There may be a need to amend or supplement these motions when access is granted.

## III.    Facts in Support of First Day Motions[3]

41.    Contemporaneously with the filing of its Chapter 11 petition, the Debtors have filed the First Day Motions.  The Debtors request that each of the First Day Motions described below be granted, as they constitute a critical element in ensuring the Debtors' successful reorganization in this Chapter 11 cases.

### A.  Joint Administration Motion

42.    By the Joint Administration Motion, the Debtors request that the Bankruptcy Court authorize and direct the joint administration of these chapter 11 cases and the consolidation thereof for procedural purposes only pursuant to Bankruptcy Rule 1015.  In addition, the Debtors request that the Clerk make an entry on the docket of each of the Debtors' cases, other than the Holdings case, stating that an order has been entered directing joint administration of these chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the Holdings' docket.

43.    The Debtors are all related entities and are filing petitions in the same Bankruptcy Court.  I believe that joint administration will be less costly and burdensome than the separate administration of the estates due to the combined docket and combined notice to creditors and parties in interest.  Many applications, motions, orders, hearings and notices will be made in these

---

[3] All capitalized terms used and not defined in this Section II shall have the meaning ascribed to it in the respective First Day Motion.

cases and will affect all of the Debtors.  Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.

44.     In addition, as the Debtors are only seeking administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be impacted.

45.     I believe that if each Debtor's case was administered independently, there would be a number of duplicative pleadings and overlapping service.  This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Bankruptcy Court's resources.

46.     Therefore, I believe that the chapter 11 cases should be jointly administered for procedural purposes only and the Joint Administration Motion should be approved.

### B. Cash Collateral Motion

47.     By the Cash Collateral Motion, the Debtors request the entry of the Interim Order and the Final Order authorizing the Debtors to use Cash Collateral (defined below), (ii) granting ELP adequate protection upon the terms set forth in interim and final orders, and (iii) scheduling a final hearing on the Motion and approving the form and manner of notice thereof.

48.     In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs.  In addition, the Debtors require cash on hand to fund their Chapter 11 cases while seeking to reorganize their business.  Postpetition use of the Cash Collateral is necessary in order for the Debtors to preserve sufficient liquidity to maintain ongoing day-to-day operations and fund its working capital needs. Due to the nature of the Debtors' businesses and the impact that a prolonged Chapter 11 cases would have on the Debtors' residents, it is imperative that the Debtors have the necessary cash on hand to successfully reorganize pursuant to the proposed Plan as quickly as possible.

49.    The Administrative Agent's security interests and liens have attached to all funds and property of the Debtors consisting of the Prepetition Collateral, including the product, issues, rents, profits and other proceeds of the Prepetition Collateral, and the Administrative Agent and ELP's security interests and liens will, notwithstanding the commencement of the Chapter 11 cases, as of the Petition Date and thereafter, attach to product, issues, rents, profits and other proceeds of the Prepetition Collateral.   Without limiting the foregoing, the Administrative Agent's security interests and liens attach to all cash (whether as original collateral or cash proceeds of the Prepetition Collateral), negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents now or hereafter in the possession, custody or control of the Debtors (as defined in Section 363(a) of the Bankruptcy Code, the "Cash Collateral").

50.    The Debtors have an emergency need for the immediate use of Cash Collateral to effectively and expeditiously manage these Chapter 11 cases.  Absent the use of Cash Collateral, the Debtors will lack the ability to ensure ongoing operations of its business.  In recognition thereof, the Administrative Agent and ELP have agreed to the use of Cash Collateral by the Debtors on terms that are usual and customary pursuant to the Budget (as defined below).

51.    The Debtors have submitted with the Cash Collateral Motion a proposed interim order granting the relief requested and permitting the use of cash collateral (the "Interim Order"). Attached to the Interim Order is a detailed operating budget for the use of the cash collateral (the "Budget").

52.    The Interim Order sets forth certain stipulations and agreements by the Debtors regarding, *inter alia*, (a) the validity and enforceability of the Loan Documents, (b) the validity and enforceability of the Debtors' Prepetition Obligations, and (c) the validity and enforceability of  the liens on and security interests in the Debtors' funds and property.  Each of the stipulations

and agreements set forth in the Interim Order are true and correct to the best of my knowledge.

53.     As adequate protection for the Debtors' use of the Cash Collateral, Debtors have agreed to provide ELP with certain replacement liens and super-priority administrative claims, each as set forth in the Cash Collateral Motion and the Interim Order.  I believe that the adequate protection proposed under the Cash Collateral Motion is warranted and appropriate.

54.     I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors, their estates and their creditors, and absent such relief, the Debtors will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

### C.  Wage Motion

55.     By the Wage Motion, Debtors are requesting the entry of an order to authorize, but not direct, the Debtors to pay certain pre-petition wages, salaries, and other compensation and authorize and direct financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments requests relating to the foregoing.

56.     Debtors utilize SHPES to provide employees to the Facility.  Debtors are obligated to fund payroll obligations to SHPES prior to SHPES processing employee payroll. SHPES in turn provides such employees with various benefits, including medical and dental insurance, COBRA benefits, paid time off, 401K savings plans and miscellaneous other employee-related benefits.  By the Wage Motion, Debtors are requesting authorization to pay to SHPES the amounts necessary to fund employee payroll in the ordinary course of business, whether such amounts represent obligations for services provided by the employees prepetition or postpetition.

57.     Debtors' employees are essential to the orderly and successful reorganization of the Debtors.  The employees have an intimate knowledge of the operation of the Debtors' businesses and any deterioration in employee morale and welfare at this critical time

undoubtedly would adversely impact the Debtors, the value of their assets and businesses, and ultimately their ability to reorganize.  Accordingly, I believe that the ability to fund the amounts owed to SHPES that are necessary compensate the employees that provide services to the Debtors in the ordinary course of business is critical to the Debtors' reorganization efforts.

58.     In addition, I believe that no amounts owed to a single employee that provides services to the Debtors for compensation is in excess of the cap set forth in Bankruptcy Code Section 507(a)(4) of $12,475.

59.     For these reasons, and for the reasons and legal arguments set forth in the Wage Motion, I believe that the relief sought in the Wage Motion should be granted.

### D.  Utilities Motion

60.     By the Utilities Motion, Debtors are requesting interim and final orders to: ((i) establishing procedures for determining requests for additional assurance of payment from utility companies; and (ii) prohibiting utility companies currently providing services, or which will provide services, to the Debtors from otherwise altering, refusing or discontinuing services to, or discriminating against the Debtors.

61.     In the ordinary course of business, Debtors obtains gas, water, sewer, electric, data, telephone, cable, and other similar utility services from approximately thirteen utility providers (the "Utility Providers").   On average, Debtors spend approximately $65,000 each month for utility services.

62.     At all relevant times, Debtors have attempted to remain current with regard to its utility bills.  To the best of my knowledge, Debtors are current on all amounts owing to the Utility Providers, other than payment interruptions that may be caused by the commencement of this Chapter 11 case.

63.     I believe that uninterrupted utility services are essential to the ongoing operations of

Debtors, and therefore, to the successful resolution of this case.  Any interruption of utility services, even for a brief period of time, would negatively affect Debtors' operations, including its ability to provide essential health care services to certain of its residents, thereby seriously jeopardizing Debtors' reorganization efforts and, ultimately, recoveries for its creditors.  It is therefore critical that utility services continue uninterrupted during this Chapter 11 case.

64.     Debtors proposes to put an amount equal to two weeks' worth of payments to the Utility Providers ($32,000) into a separate account (the "Adequate Assurance Deposit") to be held for the exclusive purpose of paying the Utility Providers.  Debtors submit that the establishment of the Adequate Assurance Deposit, in conjunction with Debtors' ability to pay for future utility services in the ordinary course of business, constitutes adequate assurance of payment to the Utility Providers.

65.     Debtors expects to have access to Cash Collateral and/or debtor in possession financing, which means that it will have liquidity sufficient to keep its utility obligations current.

66.     Finally, Debtors propose to protect the Utility Providers by establishing the Procedures provided in the Utilities Motion, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing post-petition services to Debtors that would merit greater protection.

67.     Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

### E.  Cash Management Motion

68.     By the Cash Management Motion, Debtors seeks entry of an order granting the following relief:

(a)     Authorizing Debtors to continue to use the Debtors' Cash Management System (defined below), subject to any modification or other relief granted by order of this Court relating thereto, including the following:

    (i)     the continued use of the existing Bank Accounts (defined below) with the same names and account numbers as such Bank Accounts existed immediately prior to the Petition Date (with the option of streamlining the Cash Management System by closing or consolidating Bank Accounts);

    (ii)    the ability of Debtors to deposit funds into and withdraw funds from any of the Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers and other debits;

    (iii)   the ability of Debtors to otherwise treat the Bank Accounts, along with any accounts opened post-petition, for all purposes as debtor in possession accounts;

    (iv)    the waiver of any requirements to establish separate accounts for cash collateral;

    (v)     authorizing and directing the Debtors' Banks (defined below) to maintain, service and administer such deposit accounts or investment accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable Debtors Banks and Debtors relating to such accounts;

    (vi)    authorizing the Debtors' Banks to charge and collect, and authorizing but not directing Debtors to pay, the pre-petition and post-petition service charges and other fees and expenses to which the Debtors Banks are entitled under the terms of its account agreements and/or other service documentation with Debtors;

(b)     Authorizing Debtors to continue to use its existing business forms without alteration or change; and,

(c)     allowing the Debtors a 60 day extension to either comply with the requirements of section 345(b) of the Bankruptcy Code or file a motion seeking an additional extension or waiver of the requirements of section 345(b) of the Bankruptcy Code.

69.     I believe that by using the existing Bank Accounts and investment practices, Debtors will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of Debtors, delay the administration of Debtors' estate, and increase the costs to the estates.

70.     Upon information and belief, the Debtors maintain 8 accounts (the "Bank Accounts") in the ordinary course of business with various banks and other financial institutions (the "Banks") that operate in connection with a centralized cash management system (the "Cash Management System").  Through the Bank Accounts, the Debtors efficiently collect, transfer and disburse funds generated from their operations on a daily basis.  The Debtors routinely deposit, withdraw and otherwise transfer funds to, from and between the Bank Accounts by wire transfer and/or book transfer.

71.     The Debtors maintain, among other accounts: 2 depository accounts with Bank of America, from which they collect resident funds and disperse funds to pay the payroll, vendors and other disbursements, an operating account for Chatsworth PGA Properties, LLC, also with Bank of America; finally, the Debtors maintain 2 accounts on behalf of their lenders, including a "senior lender account" with First Republic, a "debt service reserve account" with US Bank.

72.     The Debtors also maintain two required escrow accounts: (1) an account with the State of Florida, Department of Financial Services-Bureau of Collateral Management, in which restricted new resident entrance fee funds are escrowed as required by the State of Florida; and (2) a "minimum liquid reserve account," as required to ensure sufficient liquidity to provide for care of the Debtor's residents, with US Bank (such accounts together, the "Restricted Funds").

73.     Upon information and belief, the Debtors also maintain "mortgage escrow funds" held by Trimont.  At this time the Debtors are continuing to gather information relating to these accounts and is not seeking to access or move these funds at this time

74.     The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity.  Among other benefits, the Cash Management System permits Debtors to accurately monitor cash availability at all times.  The Cash Management System also permits Debtors to centrally manage and track the collection and transfer of funds, including intercompany transfers, which reduces administrative burden and expense and maximizes interest income.

75.     In addition to the Cash Management System and the Bank Accounts, the Debtors use in the ordinary course of their businesses numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices).  The Debtors have a supply of these forms on hand.  It would be expensive and wasteful, and disruptive to Debtors' business to destroy all of these forms and order new ones.

76.     Contemporaneously with the filing of the Debtors' Cash Management Motion, Debtors has filed other motions seeking authority to pay certain pre-petition obligations, including obligations to employees and other entities.  With respect to certain of these pre-petition obligations, Debtors already have issued, in the ordinary course of business, checks and other debits that have yet to clear the banking system.  In other instances, Debtors will issue checks or other debits post-petition on account of the pre-petition obligations once the Court has entered an appropriate order permitting Debtors to do so.  Debtors intend to inform the Debtors' Banks which pre-petition checks and other debits should be honored pursuant to orders of the Court authorizing such payment.

77.     I believe that the relief requested in the Cash Management Motion will help to ensure Debtors' orderly entry into Chapter 11 protection and will avoid many of the possible disruptions and distractions that could divert Debtors' attention from more pressing matters during the initial days of these Chapter 11 cases, particularly in light of the limited amount of time Debtors expects to be under Chapter 11 protection.

78.     Given the size and complexity of Debtors' business operations, any disruption of its accounting and cash management procedures would be enormously burdensome and disruptive, and could adversely impact Debtors' efforts to reorganize.  At this critical juncture, Debtors must be able to conduct "business as usual" to the extent possible.  To this end, it is essential that Debtors be permitted to continue using its existing Cash Management System and the Bank Accounts.

79.     Historically, all excess funds of Debtors have been maintained in interest-bearing domestic bank accounts insured by the United States (through the FDIC) or invested through low risk investment accounts.  The investment of Debtors' excess funds is managed exclusively through the Cash Management System.  Although Debtors' investment practices may not strictly comply in all respects with the guidelines identified in Section 345 of the Bankruptcy Code, Debtors' investments are nevertheless safe, prudent and designed to yield the maximum reasonable return on the funds invested, taking into account the safety of such deposits and investments.   Accordingly, Debtors request authority to maintain its existing investment practices and a waiver of the requirements of Section 345(b) of the Bankruptcy Code.

80.     Debtors have a complex cash management system that provides Debtors with the ability to transfer funds rapidly to ensure its safety and to maximize its investment value. Debtors and their estates will receive significant benefit from the continued investment of excess

funds.  In light of these factors, I believe that Debtors should be permitted to maintain their investment practices.

### F.  Claims Agent Application

81.     Pursuant to the Claims Agent Application, the Debtors seek authorization to retain Epiq Systems ("Epiq") as their claims, noticing and solicitation agent ("Agent").  Upon information and belief, Epiq is an experienced Agent and is frequently used by debtors in large Chapter 11 cases, and I believe Epiq is well qualified to provide such services, expertise, consultation, and assistance to the Debtors and serve as Agent in these Chapter 11 cases.  The Debtors believe that Epiq is capable of handling the requisite noticing responsibilities, thereby relieving the Clerk, or in the alternative, the Debtors, of such burden and expense.  The employment of Epiq will provide efficient management of the claims and noticing processes in these cases, thereby allowing the Debtors' management and advisors to focus on the Debtors' reorganization efforts for the benefit of the Debtors, their estates and their creditors.

82.     For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions.  I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

*[Remainder of Page Intentionally Left Blank]*

I declare under the penalty of perjury that the foregoing is true and current.

Dated: September 19, 2013

By:    Paul Rundell
Title: Chief Restructuring Officer

## **EXHIBIT A**

**Plan Support Agreement**

Execution Version

# RESTRUCTURING, LOCKUP AND
# PLAN SUPPORT AGREEMENT

This Restructuring, Lockup and Plan Support Agreement (collectively with all of the exhibits hereto which are expressly incorporated herein, the "**Restructuring Agreement**"), dated as of September 17, 2013, is entered into by and among (i) Devonshire PGA Holdings, LLC ("**Holdings**"), Devonshire at PGA National, LLC ("**DPGA**"), Chatsworth at PGA National, LLC ("**CPGA**") and Chatsworth PGA Properties, LLC ("**Chatsworth Propeties**" and, together with DPGA and CPGA, collectively the "**Debtors**"), and (ii) ELP West Palm, LLC as Senior Lender ("**ELP**").   The foregoing parties are referred to collectively herein as the "**Parties**" and individually as a "**Party**."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Term Sheet (defined herein).

# PRELIMINARY STATEMENTS

A.     The Debtors entered into a Credit and Security Agreement together with certain related lending and security agreements with Merrill Lynch Capital on or about May 1, 2007, including without limitation the documents listed on **Exhibit A** annexed hereto (collectively referred to herein as the "**Loan Documents**").  The obligations evidenced by the Loan Documents are secured by valid liens on substantially all the assets of the Debtors.

B.     On or about April 30, 2012, the obligations under the Loan Documents became due and matured by the terms of the Loan Documents.   The Debtors failed to pay such obligations.  As of September 1, 2013, approximately $158,430,862.32 remains due and owing to the Senior Lender (the "**Secured Claim**").

C.     On or about August 8, 2012 Trimont Real Estate Advisors, Inc., as Special Servicer and Administrative Agent for the then Senior Lenders ("**Trimont**"), commenced an action to foreclose the Loan Documents now pending in the Circuit Court for the Fifteenth Judicial District, Palm Beach County, State of Florida captioned <u>Trimont Real Estate Advisors, Inc. v. Devonshire at PGA National, LLC et al.</u>, Civil Division Case No. 502012CA01461 (the "**Florida Foreclosure Action**").

D.     The Parties, together with HJSI Devonshire II, LLC, the sole member and Manager of  Holdings, and the Manager and indirect sole member of DPGA, CPGA and Chatsworth Properties, have engaged in good faith negotiations with the objective of reaching an agreement regarding a proposed Chapter 11 Plan of Reorganization and satisfaction of the Secured Claim as evidenced by the "Term Sheet for Joint Plan of Reorganization of Devonshire PGA Holdings, LLC, Devonshire at PGA National LLC, Chatsworth at PGA National, LLC and Chatsworth PGA Properties dated September 17, 2013", attached hereto as **Exhibit B** (the "**Term Sheet**").  The transactions contemplated by the Term Sheet are collectively referred to herein as the "**Financial Restructuring**."  The Debtors agree to file a petition commencing a case under Chapter 11 of the United States Bankruptcy Code  (the "**Petition**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on September 19, 2013 or as soon thereafter as practicable (the "**Chapter 11 Case**").

E.      The Debtors will file a motion (the "**Plan Support Motion**") with the Bankruptcy Court seeking approval of this Restructuring Agreement as a compromise under Federal Rule of Bankruptcy Procedure 9019, and the terms embodied herein within fifteen (15) days of the date hereof and will promptly seek Bankruptcy Court approval for such motion.

F.      The Debtors agree to file a proposed Joint Chapter 11 Plan of Reorganization on substantially the terms contemplated by the Term Sheet (the "**Plan**") and a disclosure statement related thereto (the "**Disclosure Statement**") simultaneously with the petition commencing the Chapter 11 case; provided however that nothing herein shall prevent a determination by the Debtors subsequent to the date hereof that such decision is contrary to the Debtors' fiduciary duties under applicable state and federal law, in which event, upon written notice to ELP describing in detail the grounds for the Debtors' determination, and notwithstanding anything herein to the contrary, this Restructuring Agreement shall be deemed automatically terminated.

G.      The Plan and Disclosure Statement shall be in a form and substance reasonably acceptable to each of the Parties, consistent in all material respects with, and on terms and conditions no less favorable to each of the Parties than the terms and conditions set forth in this Restructuring Agreement and the Term Sheet. The Plan and Disclosure Statement shall provide for the exculpation and release of ELP and related parties, binding on all parties-in-interest, with respect to the formulation, solicitation and implementation of the Financial Restructuring, the Chapter 11 Case, the Plan, the Disclosure Statement and each of the transactions contemplated thereby.

## STATEMENT OF AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Preliminary Statements and Exhibit B. The Preliminary Statements set forth above are incorporated herein and form an integrated part of this Restructuring Agreement, subject to such modifications and amendments as may be permitted by **Section 13** hereof. Subject to the terms and conditions of this Restructuring Agreement, the Parties agree to pursue implementation of the transactions set forth in the Term Sheet in good faith by means of the consummation of the Plan.

2.      Effectiveness of Restructuring Agreement.      Upon the execution of this Restructuring Agreement by the Parties, this Restructuring Agreement will constitute the legally binding and enforceable agreement of the Parties, effective as of the date first written above.

3.      Agreements of ELP.

(a)      Ownership. ELP represents and warrants that, as of the date hereof, ELP is the sole legal or beneficial owner of the Secured Claims (except to the extent Trimont may be the owner of record of such claims for the benefit of ELP as Senior Lender) and has full power and authority to vote on and consent to the terms contained herein and in the Term Sheet.

(b)    <u>Restrictions on Transfers.</u>    ELP agrees that, as long as no Agreement Termination Event has occurred and not been waived in accordance herewith, it shall not voluntarily sell, transfer or assign the Secured Claim or any option thereon or any right or interest (voting or otherwise) therein to any party other than an affiliate or subsidiary of ELP.

(c)    <u>Voting on the Plan.</u>    ELP agrees that, subject to the terms and conditions of this Restructuring Agreement and so long as no Agreement Termination Event has occurred and not been waived in accordance herewith, it will vote all its Claims (as defined in Bankruptcy Code Section 101(5)) to accept the Plan by the applicable deadlines to be established by the Bankruptcy Court as may be set forth in the Disclosure Statement.

(d)    <u>Support.</u>    So long as no Agreement Termination Event has occurred and not been waived in accordance herewith, ELP agrees that it will not:

(i).    support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning any Debtor or its assets other than the Financial Restructuring;

(ii).    object to or otherwise commence any proceeding opposing any of the terms of this Restructuring Agreement, the Term Sheet, the Disclosure Statement or the Plan;

(iii).    take any action inconsistent with the Financial Restructuring, the transactions contemplated hereby, or the expeditious confirmation and consummation of such transactions;

(iv).    vote against the Plan or otherwise agree to, consent to, or provide any support to any other Chapter 11 plan or other restructuring or sale or liquidation of assets concerning any Debtor or its assets other than the Financial Restructuring; and

(v).    object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Financial Restructuring (or any other document filed in furtherance of, and that is, in ELP's reasonable judgment, consistent with the Financial Restructuring) or take any other action that is inconsistent with consummation of the Plan and the Financial Restructuring, except to the extent necessary to protect its interests in the collateral securing the Secured Debt or the Secured Claims or the preservation of its rights, claims and interests in the Chapter 11 Case.

(e)    <u>Adequate Information; Compliance with Bankruptcy Code Section 1125(g).</u>    ELP agrees that it has obtained adequate information regarding the Financial Restructuring and that the Debtors have provided all material, relevant information that ELP has requested in advance of executing this Restructuring Agreement. Additionally, ELP agrees that, for purposes of this Restructuring Agreement, the solicitation of its

support of the Plan in accordance with the terms and conditions hereof complies with applicable law and that ELP was solicited in a manner complying with applicable law.

(f)     <u>Appearing in the Bankruptcy Court.</u>  Notwithstanding any provision in this Restructuring Agreement, nothing in this Restructuring Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Restructuring Agreement and the Financial Restructuring and are not for the purpose of hindering, delaying or preventing the consummation of the Financial Restructuring.

(g)     <u>Actions by Trimont</u>.  To the extent it is necessary for Trimont, as Administrative Agent for ELP, to any actions to effectuate ELP's obligations hereunder, ELP shall cause Trimont to take such actions.

4.     <u>Representations and Warranties of the Debtors.</u> Each Debtor represents and warrants to ELP that the following statements are true, correct and complete as of the date hereof:

(a)     they have all requisite authority to enter into this Restructuring Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated by this Restructuring Agreement, and perform its obligations contemplated hereunder, and the execution and delivery of this Restructuring Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership or other similar action on its part;

(b)     the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by it of this Restructuring Agreement does not and shall not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)     the execution, delivery, and performance by it of this Restructuring Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body;

(d)     to the best of its knowledge, after reasonable diligence, the information it has provided in connection with the Financial Restructuring and this Restructuring Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

(e)     subject to any necessary Bankruptcy Court approval, this Restructuring Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms.

5. <u>Representations and Warranties of ELP</u>. ELP represents and warrants to the Debtors that the following statements are true, correct and complete as of the date hereof:

(a) it has all requisite corporate, partnership, limited liability company or similar authority to enter into this Restructuring Agreement and perform its obligations contemplated by this Restructuring Agreement, and the execution and delivery of this Restructuring Agreement and the performance of ELP's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership or other similar action on its part;

(b) the execution and delivery, performance by ELP of this Restructuring Agreement does not and shall not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c) the execution, delivery and performance by ELP of this Restructuring Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d) this Restructuring Agreement is the legally valid and binding obligation of ELP, enforceable in accordance with its terms.

6. <u>Agreements of the Debtors.</u> The Debtors agree that, consistent with their business judgment and the exercise of their fiduciary duties, they have agreed that the following are material covenants and conditions to the agreements contained herein:

(a) The Debtors will use commercially reasonable efforts to obtain any necessary approval for the Financial Restructuring as expeditiously as is reasonably practicable under applicable law, including the solicitation of requisite acceptances pursuant to the Disclosure Statement;

(b) The Debtors will use commercially reasonable efforts to obtain any and all requisite regulatory or third party approvals necessary to consummate the Financial Restructuring as promptly as is reasonably practicable;

(c) The Debtors will use commercially reasonable efforts to file the Plan and the Disclosure Statement, each in a form and substance reasonably acceptable to ELP, simultaneously with the Chapter 11 Petition;

(d) The Debtors will use commercially reasonable efforts to obtain a combined hearing from the Bankruptcy Court to consider approval of the Disclosure Statement and confirmation of the Plan;

(e) The Debtors will use commercially reasonable efforts to obtain from the Bankruptcy Court an order confirming the Plan in a form and substance reasonably acceptable to ELP (the "**Confirmation Order**"); and

(f)     The Debtors agree to take no action inconsistent with the Financial Restructuring, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions, except as otherwise permitted under this Restructuring Agreement.

Notwithstanding the foregoing, nothing herein shall prevent a determination by the Debtors subsequent to the date hereof that the Debtors' compliance with the covenants in this Section 6 or any other obligations or agreement contained in this Restructuring Agreement is contrary to the Debtors' fiduciary duties under applicable state and federal law by giving written notice thereof to ELP describing in detail the grounds for the Debtors' determination, in which event this Restructuring Agreement shall, notwithstanding anything herein to the contrary, be deemed automatically terminated.

7.      <u>Agreements of the Debtors.</u> The Debtors agree that they will take such actions as are reasonably necessary to cause the Debtors to perform their obligations under Section 6 of this Restructuring Agreement, subject to the other terms and conditions of this Restructuring Agreement.

8.      <u>Termination of Agreement.</u>  Upon the occurrence of an Agreement Termination Event, this Restructuring Agreement shall automatically terminate without further action of the Parties or action or order of the Bankruptcy Court unless no later than five (5) business days after the occurrence of such Agreement Termination Event, the occurrence of such Agreement Termination Event is waived in writing by ELP.  The occurrence of any one or more the following shall constitute an "**Agreement Termination Event**":

(a)     The Term Sheet is withdrawn, modified or amended, without ELP's prior written consent, in a manner having a material adverse effect on ELP's rights, remedies or interests;

(b)     The Plan is withdrawn, modified or amended, without ELP's prior written consent, in a manner having an adverse effect on ELP's rights, remedies or interests;

(c)     The Debtors fail to file the Plan simultaneously with the Chapter 11 Petition;

(d)     The Debtors:

(i)      file or support confirmation of, or fail to actively oppose confirmation of, a plan of reorganization which requests or would result in a withdrawal, modification or amendment that changes the treatment of the Secured Claim under the Plan in a manner that adversely affects the holder of the Secured Claim's rights, remedies or interests;

(ii)     files a motion, objection, lawsuit, administrative or adversary proceeding, or otherwise assists in any of the foregoing, which requests or would result in a withdrawal, modification or amendment that changes the treatment of the Secured Claim under the Plan in a manner that adversely affects such holder's rights, remedies or interests;

(iii)    files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the claims of ELP or its liens, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in any way the claims of ELP or its liens, or asserting a claim against ELP to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against ELP.

(e)    Following the date of this Restructuring Agreement, the Bankruptcy Court has:

(i)    not approved the Disclosure Statement within 60 days, or by such later date as is agreed to in writing by ELP's Consent;

(ii)    not entered the Confirmation Order within 90 days, or by such later date as is agreed to in writing by ELP's consent;

(iii)    entered an order denying confirmation of the Plan; or

(iv)    entered an order dismissing the Chapter 11 Case or an order pursuant to Section 1112 of the Bankruptcy Code converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

(f)    A termination event has occurred under an order granting the Debtors authority to use cash collateral (which for purposes hereof shall include any interim or final cash collateral order);

(g)    The effective date of the Plan shall not have occurred within 120 days after the filing of the Petition;

(h)    An injunction, judgment, order, decree, ruling or charge shall have been entered that prevents consummation of the Financial Restructuring;

(i)    There is a mutual written agreement to terminate this Restructuring Agreement between the Debtors and ELP;

(j)    Failure by the Debtors to comply with any of its other obligations under this Restructuring Agreement, and such failure is not cured within five (5) Business Days after written notice thereof has been given by ELP to the Debtors;

(k)    Failure by ELP to comply with their other obligations under this Restructuring Agreement, and such failure is not cured within five (5) Business Days after written notice thereof has been given by the Debtors to ELP; or

(l)    The earliest of (i) the effective date of the Plan, (ii) March 30, 2014, or unless such date has been extended by ELP; or

(m)    11:59 p.m. Eastern Time on the fourteenth (14th) calendar day after the date of this Restructuring Agreement, if the Petition has not been filed by such time.

9.    <u>Interim Loan</u>.  ELP hereby agrees to loan the Debtors the sum of $385,000 as a protective advance under the Loan Documents in order to fund a retainers to Debtors' counsel and financial advisor in the Chapter 11 cases.

10.    <u>Effect of Termination</u>.  Subject to Section 16 of this Restructuring Agreement, upon termination of this Restructuring Agreement, all obligations hereunder, shall terminate and shall be of no force and effect, provided that any claim or causes of action for breach of this Restructuring Agreement shall survive termination and all rights and remedies of the non-breaching Party with respect to such claims or causes of actions shall be fully preserved and not be prejudiced in any way, and provided further that the breach of this Restructuring Agreement by one or more Parties shall not create any rights or remedies against the non-breaching Party.

11.    <u>Forbearance.</u>  The Debtors acknowledge that the obligations evidenced by the Loan Documents have matured, are fully due and owing and that the Debtors have no defenses, counter-claims or offsets with respect to such obligations.  ELP agrees that so long as this Restructuring Agreement remains in effect and has not terminated, that it will forebear from exercising any and all remedies under the Loan Documents.  The Parties agree to stay the Florida Foreclosure Action until (i) such time as the transactions contemplated hereunder may be consummated, or (ii) the occurrence of an Agreement Termination Event.

12.    <u>Cooperation; Further Assurances;</u>.  The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable) in respect of all actions reasonably necessary to consummate the Financial Restructuring.

13.    <u>Amendments.</u>  This Restructuring Agreement may not be modified, amended or supplemented except in a writing signed by the Debtors and ELP.

14.    <u>GOVERNING LAW; JURISDICTION.</u>    THIS RESTRUCTURING AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS RESTRUCTURING AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS RESTRUCTURING AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND BY EXECUTION AND DELIVERY OF THIS RESTRUCTURING AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.

15.    <u>Specific Performance; Damages.</u>  It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Restructuring Agreement are uncertain at the time of entering into this Agreement and that breach of this Restructuring

Agreement would result in damages that would be difficult to determine with certainty.  It is understood that money damages would not be a sufficient remedy for any breach of this Restructuring Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach.  Such remedies shall not be deemed to be the exclusive remedies for breach of this Agreement by any Party or its representatives, but shall be in addition to all other remedies available at law or in equity.

16.    <u>Survival.</u>  Notwithstanding any termination of this Restructuring Agreement, the agreements and obligations in **Sections 10, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24, 25, 26 and 27** shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

17.    <u>Headings.</u>  The headings of the Sections, paragraphs and subsections of this Restructuring Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

18.    <u>Successors and Assigns; Severability; Several Obligations.</u>  This Restructuring Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.

19.    <u>No Third-Party Beneficiaries.</u>  Unless expressly stated herein, this Restructuring Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

20.    <u>Consideration.</u>  It is hereby acknowledged by the Parties that no consideration shall be due or paid to ELP for its agreement to support the Financial Restructuring and vote in favor of the Plan in accordance with the terms and conditions of this Restructuring Agreement, other than the Debtors' agreement to pursue the Financial Restructuring and file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Restructuring Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

21.    <u>Prior Negotiations; Entire Agreement.</u>  This Restructuring Agreement constitutes the entire agreement of the Parties related to the Financial Restructuring, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties acknowledge that the Loan Documents shall continue in full force and effect.

22.    <u>Counterparts.</u>  This Restructuring Agreement and any amendments, consents or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Facsimile or scanned signatures on this Restructuring Agreement shall be treated as originals for all purposes.

23.    <u>Construction.</u>  This Restructuring Agreement shall be deemed to have been negotiated and prepared at the joint request, direction and construction of the Parties, at arm's length and be interpreted without favor to any Party.

24.    <u>Time of the Essence</u>.  Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Restructuring Agreement.

25.    <u>Notices.</u>    All notices, demands, requests, consents, approvals and other communications ("**Notice**" or "**Notices**") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below), or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

To Debtors:          R. Jeffrey Sands
                     Principal
                     HJ Sims Investments, LLC
                     2150 Post Road, Suite 301
                     Fairfield, CT 06824
                     Email: jsands@hjsims.com
                     Telephone: (203) 418-9002

With copy to:        John D. Ruffier, Esq.
                     Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
                     215 N. Eola Drive
                     Orlando, Florida 32801
                     Email:  john.ruffier@lowndes-law.com
                     Telephone:  407-418-6414

                     - and -

                     M. Blake Cleary, Esq.
                     Young Conaway Stargatt & Taylor, LLP
                     Rodney Square
                     1000 North King Street
                     Wilmington, DE 19801
                     Email: mbcleary@ycst.com
                     Telephone:  (302) 571-6714

To ELP:              Gerald F. Doherty
                     Senior Vice President & General Counsel
                     Erickson Living Properties, LLC
                     701 Maiden Choice Lane
                     Baltimore, MD 21228
                     Email: Gerald.Doherty@erickson.com
                     Telephone: (410) 402-2350

With copy to:                    Thomas R. Califano
                                 DLA Piper LLP (US)
                                 1251 Avenue of the Americas
                                 New York, NY 10020
                                 Email: thomas.califano@dlapiper.com
                                 Telephone: (212) 335-4990

or to such other addresses a Party may hereafter designate. Notice by courier or messenger service or by express or overnight mail, shall be effective upon receipt. Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message. Notice by mail, shall be complete at the time of deposit in the U.S. mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any party, automatically extended three (3) days. The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder in connection with giving any notice under this Restructuring Agreement (and agree not to object to any non-breaching Party seeking to lift the automatic stay in connection with giving any such notice, if necessary).

26. <u>Reservation of Rights.</u> Except as expressly provided in this Restructuring Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of ELP to protect and preserve its rights, remedies and interests, including its Claims against the Debtors. Nothing herein shall be deemed an admission of any kind. If the transactions contemplated herein are not consummated, or this Restructuring Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Restructuring Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

27. <u>Press Releases and Third Party Communications.</u> Except as expressly contemplated herein including as contemplated with respect to the Disclosure Statement, without the prior written consent of the Parties hereto, no Party will (or will permit any of its subsidiaries, affiliates, agents or representatives to) show this Restructuring Agreement or any of the Exhibits attached hereto (or otherwise disclose the existence or all or a portion of the contents hereof) to any third party (other than to the Parties and the respective officers, directors, employees, accountants, attorneys and financial advisors of each the Parties); *provided that* each Party hereto shall be permitted to issue a public statement or disclose the contents of the Restructuring Agreement as required by law, regulation or court or administrative order, in which case the Party making the disclosure shall use all reasonable efforts to consult with, and provide a copy of all proposed written disclosure to, the other Parties hereto prior to such disclosure.

28. <u>Restructuring Agreement Not a Plan.</u> This Restructuring Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the

Plan and the Plan becomes effective in accordance with its terms.  This Restructuring Agreement is not intended to constitute a solicitation or acceptance of the Plan and solicitation of the Plan will only occur after the approval by the Bankruptcy Court of an appropriate Disclosure Statement.

[Signatures continued on next page.]

IN WITNESS WHEREOF, the Parties have caused this Restructuring Agreement to be duly executed under seal all as of the date first above written.

**DEVONSHIRE PGA HOLDINGS, LLC**
**By: HJSI Devonshire II, LLC, its Manager**
By: *HJSI Devonshire, LLC, its Manager*
By: *HJ Sims Investments, LLC, its Manager*

By: *[signature]*
Name: *R. Jeffrey Sands*
Title: *Managing Director*

**DEVONSHIRE AT PGA NATIONAL, LLC**
**By: HJSI Devonshire II, LLC, its Manager**
By: *HJSI Devonshire, LLC, its Manager*
By: *HJ Sims Investments, LLC, its Manager*

By: *[signature]*
Name: *R. Jeffrey Sands*
Title: *Managing Director*

**CHATSWORTH AT PGA NATIONAL, LLC**
**BY: HJSI DEVONSHIRE II, LLC, ITS MANAGER**
By: *HJSI Devonshire, LLC, its Manager*
By: *HJ Sims Investments, LLC, its Manager*

By: *[signature]*
Name: *R. Jeffrey Sands*
Title: *Managing Director*

**CHATSWORTH PGA PROPERTIES, LLC**
**BY: HJSI DEVONSHIRE II, LLC, ITS MANAGER**
By: *HJSI Devonshire, LLC, its Manager*
By: *HJ Sims Investments, LLC, its Manager*

By: *[signature]*
Name: *R. Jeffrey Sands*
Title: *Managing Director*

**ELP WEST PALM, LLC**
**By: Erickson Living Properties, LLC, Its Sole Member**

By: _____
Name: Gerald F. Doherty
Title: Senior Vice President & General Counsel

13

IN WITNESS WHEREOF, the Parties have caused this Restructuring Agreement to be duly executed under seal all as of the date first above written.

**DEVONSHIRE PGA HOLDINGS, LLC**
**By: HJSI Devonshire II, LLC, its Manager**

By: _____
Name: _____
Title: _____

**DEVONSHIRE AT PGA NATIONAL, LLC**
**By: HJSI Devonshire II, LLC, its Manager**

By: _____
Name: _____
Title: _____

**CHATSWORTH AT PGA NATIONAL, LLC**
**BY: HJSI DEVONSHIRE II, LLC, ITS MANAGER**

By: _____
Name: _____
Title: _____

**CHATSWORTH PGA PROPERTIES, LLC**
**BY: HJSI DEVONSHIRE II, LLC, ITS MANAGER**

By: _____
Name: _____
Title: _____

**ELP WEST PALM, LLC**
**By: Erickson Living Properties, LLC, Its Sole Member**

By: _____
Name: Gerald F. Doherty
Title: Senior Vice President & General Counsel

13

## EXHIBIT A

### LOAN DOCUMENTS

1.  Credit and Security Agreement dated as of May 1, 2007 (as amended, restated or otherwise modified from time to time) among Devonshire at PGA National, LLC, Chatsworth PGA Properties, LLC and Chatsworth at PGA National, LLC and the Lender parties thereto (the "**Credit Agreement**").

2.  Mortgage Assignment of Leases and Rents, Security Agreement and Fixture Filing among the Merrill Lynch Capital, Devonshire at PGA National, LLC and Chatsworth PGA Properties, LLC dated May 1, 2007.

3.  Assignment of Liens and Rents among Merrill Lynch Capital, Devonshire at PGA National, LLC and Chatsworth PGA Properties, LLC dated May 1, 2007.

4.  Conditional Assignment of Management Agreement among Merrill Lynch Capital, Chatsworth at PGA National, LLC and SHP Healthcare Services, LLC dated May 1, 2007.

5.  Conditional Assignment of Management Agreement among Merrill Lynch Capital, Devonshire at PGA National, LLC and SHP Senior Living Services, LLC dated May 1, 2007.

6.  Collateral Assignment of Interest Rate Hedge Agreement among Merrill Lynch Capital, Devonshire at PGA National, LLC at Chatsworth PGA Properties , LLC dated May 1, 2007.

7.  Subordination and Attornment Agreement among Chatsworth at PGA National, LLC as tenant and Chatsworth PGA Properties LLC as landlord and Merrill Lynch Capital dated May 1, 2007.

8.  Co-Lender and Servicing Agreement dated August ___, 2007 (sic) by and among Devonshire Funding Company, Inc., Capmark Bank, Landesbank Sachsen Girozentrale, and Merrill Lynch Capital.

9.  Those other certain instruments, documents, and agreements executed in connection therewith, including the Financing Documents (as defined in the Credit Agreement) and any and all amendments, restatements, supplements, modifications or waivers entered into in connection therewith.

## EXHIBIT B

## TERM SHEET FOR THE JOINT PLAN OF REORGANIZATION OF DEVONSHIRE PGA HOLDINGS, LLC, DEVONSHIRE AT PGA NATIONAL, LLC, CHATSWORTH AT PGA NATIONAL, LLC AND CHATSWORTH PGA PROPERTIES, LLC

## Dated September 17, 2013

This term sheet sets forth the principal terms of the understanding among Devonshire PGA Holdings, LLC, Devonshire at PGA National, LLC, Chatsworth at PGA National, LLC, Chatsworth PGA Properties, LLC (collectively, the "**Debtors**"), HJSI Devonshire II, LLC ("**HJSI-II**") and ELP West Palm, LLC ("**ELP**") regarding a proposed Chapter 11 Plan of Reorganization for the Debtors and satisfaction of ELP's claims against the Debtors under that certain Credit and Security Agreement dated as of May 1, 2007 among the Debtors and Merrill Lynch Capital, together with all lending and security agreements and documents related thereto, as they may have been amended, modified, restated or supplemented from time to time. This term sheet is for discussion purposes and is non-binding, except to the extent incorporated by reference into that certain Restructuring, Lockup and Plan Support Agreement of even date herewith by and among the Debtors and ELP (the "**Restructuring Agreement**"), and then only to the extent made expressly binding by the terms of the Restructuring Agreement. Capitalized terms used but not defined herein shall have the meaning assigned in the Restructuring Agreement.

1. <u>Termination of Equity Interest</u>. On the effective date of the Bankruptcy Court's order confirming the Plan (the "**Plan Effective Date**"), all right, title and interest, direct and indirect, of HJSI-II in its subsidiary Devonshire PGA Holdings, LLC ("**Holdings**") shall be fully and forever extinguished. Without limiting the generality of the foregoing, on the Plan Effective Date:

(a)    HJSI-II shall cease to be a member of Holdings, or to have any interest whatsoever in it and all interests of Holdings in its subsidiaries shall be transferred to ELP or its designees;

(b)    HJSI-II shall, if then serving as the Manager of any of the Debtors, be automatically removed from such capacity; and

(d)    If any individual employee, agent or representative of HJ Sims is then serving as an officer of any of the Debtors, he/she shall be automatically removed from such office.

2. <u>Cash Payment</u>. On the Plan Effective Date, ELP shall pay to HJSI-II (or an affiliate thereof designated by HJSI-II) Three Million Dollars ($3,000,000.00) by wire transfer of immediately available funds to an account specified by HJSI-II.

3. <u>Cross-Releases</u>. On the Plan Effective Date, unless such releases are set forth in the confirmed Plan, (i) ELP, for itself and on behalf of its affiliates, (including without limitation the Debtors) shall execute a general release of all claims in favor of HJSI-II and its affiliates, and (ii) HJSI-II, for itself and on behalf of its affiliates, shall execute a general release of all claims in favor of ELP and its affiliates.