**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                                                             :
In re:                                                       :    Chapter 11
                                                             :
DEVONSHIRE PGA HOLDINGS, LLC,                                :    Case No. 13-12460 (_____)
*et al.*,[1]                                                 :
                                                             :    (Joint Administration Pending)
Debtors.                                                     :
                                                             x
-------------------------------------------------------------

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
ADMINISTRATIVE AGENT AND (III) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),[2] by

their proposed attorneys, hereby move (the "Motion"), pursuant to Sections 361, 362, 363 and

364 of Title 11 of the United States Code (the "Bankruptcy Code"), for entry of interim and final

orders (the "Cash Collateral Orders") (i) authorizing the Debtors to use Cash Collateral (defined

below), (ii) granting the Secured Lender (defined below) adequate protection upon the terms set

forth in interim and final orders, and (iii) scheduling a final hearing on the Motion and approving

the form and manner of notice thereof.  In support of this Motion, the Debtors respectfully

represent as follows:

**Jurisdiction And Venue**

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and

the Amended Standing Order of Reference from the United States District Court for the District

---

[1]      The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Devonshire PGA Holdings, LLC (2843) , Devonshire at PGA National, LLC (2904), Chatsworth at PGA National, LLC (3412) and Chatsworth PGA Properties, LLC (3472).  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 350 Devonshire Way, Palm Beach Garden, FL 33418.

[2]      Capitalized terms used but not defined herein shall have the meanings set forth in the Rundell Declaration.

of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).

Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Sections 105, 361, 362,

363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014.

<u>**Background**</u>

**A.      General Background**

3.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced these cases by

filing voluntary petitions for relief under Chapter 11 the Bankruptcy Code.

4.      No Trustee, examiner or creditors' committee has been appointed in these cases.

5.      The Debtors continue in the possession of their property and continue to operate

and manage their business as debtors in possession pursuant to Bankruptcy Code Sections

1107(a) and 1108.

6.      The factual background relating to the Debtors' commencement of these Chapter

11 cases and the facts and circumstances supporting the relief requested herein are set forth in

greater detail in the Declaration of Paul Rundell in Support of Chapter 11 Petition and First Day

Motions (the "<u>Rundell Declaration</u>") filed contemporaneously with this Motion and incorporated

herein by reference.

7.      The Debtors intend to file a Chapter 11 plan of reorganization (the "<u>Plan</u>"),

negotiated with the Debtors' secured creditor prior to filing these cases, which will allow the

Debtors to stabilize their business operations, restructure their debt obligations, ensure unsecured

creditors are paid in full and allow residents of the CCRC (as hereinafter defined) to have the

security of knowing the CCRC will continue with uninterrupted operations.  Pursuant to a

support agreement entered into prior to the Petition Date, the Plan is supported by the holder of

100% of the Debtors' secured claims, ELP West Palm, LLC ("the "<u>Secured Lender</u>").

**B.**    **Cash Collateral**

8.    The Debtors are obligated in accordance with the following:

(a)    Mortgage Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Devonshire at PGA National, LLC and Chatsworth PGA Properties, LLC for the benefit of Merrill Lynch Capital (together with any successor Administrative Agent, the "Administrative Agent") dated May 1, 2007;

(b)    Assignment of Liens and Rents among Merrill Lynch Capital, Devonshire at PGA National, LLC and Chatsworth PGA Properties, LLC dated May 1, 2007;

(c)    Conditional Assignment of Management Agreement among Merrill Lynch Capital, Chatsworth at PGA National, LLC and SHP Healthcare Services, LLC dated May 1, 2007;

(d)    Conditional Assignment of Management Agreement among Merrill Lynch Capital, Devonshire at PGA National, LLC and SHP Senior Living Services, LLC dated May 1, 2007;

(e)    Collateral Assignment of Interest Rate Hedge Agreement among Merrill Lynch Capital, Devonshire at PGA National, LLC and Chatsworth PGA Properties, LLC dated May 1, 2007;

(f)    Subordination and Attornment Agreement among Chatsworth at PGA National, LLC as tenant and Chatsworth PGA Properties LLC as landlord and Merrill Lynch Capital dated May 1, 2007;

(g)    the Credit and Security Agreement dated as of May 1, 2007 among Devonshire at PGA National, LLC, Chatsworth PGA Properties, LLC and Chatsworth at PGA National, LLC, as Borrowers (each such party referred to herein as a "Senior Loan Borrower" and collectively as the "Senior Loan Borrowers"), and the Lender parties thereto (each such party and their successors and assigns are referred to herein as a "Senior Loan Lender" and collectively as the "Senior Loan Lenders");

(h)    that certain Promissory Note (Note A), dated as of May 1, 2007, made by the Senior Loan Borrowers, in the original principal amount of $75,000,000;

(i)    that certain Amended and Restated Term Note (Note B-1) dated as of July 25, 2007, made by the Senior Loan Borrowers, in the original principal amount of Twenty Million Dollars ($20,000,000);

(j)    that certain Amended and Restated Term Note (Note B-2) dated as of July 2007 (sic), made by the Senior Loan Borrowers in the original principal

amount of Twenty Million Dollars ($20,000,000);

(k)      that certain Term Note (Note C) dated as of May 1, 2007, made by the Senior Loan Borrowers in the original principal amount of Forty Million Two Hundred Twenty Thousand Dollars ($40,220,000);

(l)      that certain Security Agreement dated as of May 1, 2007 by and between Devonshire Associates, Ltd., the Administrative Agent and the Senior Loan Lenders;

(m)      that certain Ownership Pledge, Assignment and Security Agreement, dated as of May 1, 2007, by and between Devonshire Associates, Ltd., the Administrative Agent and the Senior Loan Lenders;

(n)      that certain Assignment of Rents and Leases, dated as of May 1, 2007 by the Senior Loan Borrowers to the Administrative Agent and the Senior Loan Lenders;

(o)      that certain Environmental Indemnity Agreement, dated as of May 1, 2007, by the Senior Loan Borrowers in favor of the Administrative Agent, for the Senior Loan Lenders;

(p)      that certain Non-Recourse Payment Guaranty, dated as of May 1, 2007, made by Devonshire PGA Holdings, LLC in favor of the Administrative Agent, for the Senior Loan Lenders;

(q)      that certain Guaranty of Non-Recourse Carveouts Agreement, dated as of May 1, 2007, made by Craig E. Anderson, an individual, in favor of the Administrative Agent, for the Senior Loan Lenders;

(r)      that certain Acknowledgement and Subordination Agreement, dated as of May 1, 2007, between U.S. Bank National Association, as Trustee under that certain Indenture of Trust and Mortgage between Devonshire Associates, Ltd. and First Union National Bank of Florida, date as of May 1, 2007, and the Senior Loan Lenders;

(s)      that certain Subordination, Attornment and Non-Disturbance Agreement, dated as of May 1, 2007, between National City Bank, as successor in interest to Fidelity Bank & Trust f/k/a Fidelity Federal Savings Bank of Florida Inc., the Administrative Agent and the Senior Loan Lenders;

(t)      that certain Additional Agreement Regarding Purchase Agreement, dated as of May 1, 2007, between SHP Senior Living Investments, LLC, the Senior Loan Borrowers, and the Administrative Agent for the Senior Loan Lenders;

(u)      that certain Appointment, Assumption and Amendment Agreement, dated as of April 20, 2012, between Devonshire Funding Company, Inc.,

Landesbank Baden-Württemberg, GE Business Financial Services Inc., Capmark, and the Administrative Agent; and

(v)     that certain Sideletter Agreement, dated as of April 20, 2012, between Devonshire Funding Company, Inc., Landesbank Baden-Württemberg, GE Business Financial Services Inc., Capmark Bank and the Administrative Agent.[3]

Collectively the above are referred to herein as the "Loan Documents."

9.     The Loan Documents secure, among other things, promissory notes in the original principal amount of $161,620,000 (the "Senior Loans").

10.     Under the Loan Documents, the Debtors granted to the Administrative Agent liens on and security interests in substantially all of the Debtors' assets (the "Prepetition Collateral").

11.     The Administrative Agent's security interests and liens have attached to all funds and property of the Debtors consisting of the Prepetition Collateral, including the product, issues, rents, profits and other proceeds of the Prepetition Collateral, and the Administrative Agent and Secured Lender's security interests and liens will, notwithstanding the commencement of the Chapter 11 cases, as of the Petition Date and thereafter, attach to product, issues, rents, profits and other proceeds of the Prepetition Collateral.  Without limiting the foregoing, the Administrative Agent's security interests and liens attach to all cash (whether as original collateral or cash proceeds of the Prepetition Collateral), negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents now or hereafter in the possession, custody or control of the Debtors (as defined in Section 363(a) of the Bankruptcy Code, the "Cash Collateral").

12.     The Cash Collateral is generated from various sources and held in different

---

[3]     The Letter of Credit was terminated by the parties thereto in February of 2013, following mandatory tender for and purchase of the 2007C Bonds.

accounts by the Debtors.  The Debtors generate Cash Collateral in the form of operating cash to fund its daily operations from monthly service fees charged to residents of the CCRC (as defined below).  These funds are used for regular operating disbursements.  The Debtors also generate Cash Collateral from the collection of entrance fees paid by incoming residents of units at the CCRC, which are held in an escrow account subject to the security interests of the Administrative Agent.  The Debtors hold but do not regularly use certain funds in designated accounts, including a segregated professional fee account, an escrow account for initial deposits paid by prospective residents to reserve a unit at the Property (as defined below), statutory reserves, and an account for Entrance Fees held for future use.

13.     Pursuant to this Motion, the Debtors request authority, with the consent of the Administrative Agent, to use Cash Collateral in accordance with and to be governed by the Budget (as defined below) in all respects.

**C.     The Debtors' Need For Use Of Cash Collateral**

14.     Prior to the Petition Date, the Debtors financed the operations of their continuing care retirement community ("CCRC") with cash from operating activities, including collection of entrance fees and monthly service fees, and the proceeds of the Senior Loans.

15.     In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs.  In addition, the Debtors require cash on hand to fund their Chapter 11 cases while seeking to reorganize their business.  Postpetition use of the Cash Collateral is necessary in order for the Debtors to preserve sufficient liquidity to maintain ongoing day-to-day operations and fund its working capital needs. Due to the nature of the Debtors' businesses and the impact that a prolonged Chapter 11 cases would have on the Debtors' residents, it is imperative that the Debtors have the necessary cash on hand to successfully reorganize pursuant to the proposed Plan as quickly as possible.

01:14129669.1

16.     If the Debtors are unable, on a consistent basis, to maintain their business and demonstrate financial stability to existing and future residents, the CCRC will lose existing residents, employees, and vendors, will be unable to attract new residents and will be forced to cease operations.  This will not only cause harm to the Debtors, but it will also cause harm to the residents, who will not receive proper care and may be forced to move.  Therefore, the use of cash collateral is essential to the Debtors' continued ability to operate, to maintaining the value of its assets, and to the success of these Chapter 11 cases.  Moreover, the Administrative Agent and Senior Lender have consented and agreed to the relief requested herein.

17.     The Debtors believe that the proposed adequate protection herein is sufficient to protect any diminution in the value of the Administrative Agent's interests and is fair and reasonable.  The Administrative Agent for the benefit of the Senior Lender will be adequately protected and, as a result, will not be prejudiced in any way by the Debtors' use of Cash Collateral.  Given these circumstances, the Court should authorize the use of Cash Collateral on the terms and conditions set forth herein.

18.     The Debtors have an emergency need for the immediate use of Cash Collateral to effectively and expeditiously manage these Chapter 11 cases.  Absent the use of Cash Collateral, the Debtors will lack the ability to ensure ongoing operations of its business.  In recognition thereof, the Administrative Agent and the Senior Lender have agreed to the use of Cash Collateral by the Debtors on terms that are usual and customary pursuant to the Budget, attached hereto as **Exhibit B**, and in accordance with the form of order that accompanies this Motion.

## Relief Requested

19.     By this Motion, the Debtors seek entry of the Interim Order and Final Order, pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363 and 364, (a) authorizing the Debtors

01:14129669.1

to use the Cash Collateral of the Secured Lender, (b) granting the Administrative Agent and Secured Lender adequate protection upon the terms set forth in the interim and final orders, and (c) scheduling a final hearing on the Motion and approving the form and manner of notice thereof.

20.     The Debtors have submitted herewith a proposed interim order granting the relief requested herein (the "Interim Order").  Attached hereto as **Exhibit B** is an operating budget (the "Budget") to which the Administrative Agent and Secured Lender have agreed and that will govern the use of the Cash Collateral.  Certain of the terms of the Interim Order are summarized below:

| Term | Brief Summary |
|---|---|
| **Use of Cash Collateral** | The Debtors are authorized to use Cash Collateral on an interim basis pending a final determination by the Court upon the terms and conditions set forth in the Interim Order and in accordance with the Budget from the Petition Date through and including the earlier of (a) the date of the final hearing on the Debtors' use of Cash Collateral or (b) termination of the Interim Order following issuance of a Termination Notice as set forth in Paragraph 10 of the Interim Order. |
| **Adequate Protection** | The Administrative Agent and Secured Lender are entitled to adequate protection of their interest in the Cash Collateral.  The following adequate protection (collectively, the "Adequate Protection") shall be provided: <br><br> (a) As security for and solely to the extent of any diminution in the value of the Administrative Agent and Secured Lender's Prepetition Collateral from and after the Petition Date, calculated in accordance with Bankruptcy Code Section 506(a) (a "Diminution in Value"), the Administrative Agent and Secured Lender shall have senior priority replacement liens upon all assets and property of the Debtors and their estates of any kind or nature whatsoever, now existing or hereafter acquired, including, without limitation, the Prepetition Collateral (the "Replacement Liens"), but excluding all claims and causes of action, and the products and proceeds thereof, arising under or permitted by Sections 502(d), 506(c), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code |

| | |
|---|---|
| | and any other avoidance claims and causes of action arising under state or federal law; provided, however, that the Replacement Liens shall be subject and subordinate to (a) the Carve-Out (defined below) and (b) the Prior Senior Liens (as defined in the Interim Order).<br><br>(b)  The Replacement Liens are in addition to all security interests, liens, and rights of setoff existing in favor of the Administrative Agent and Secured Lender on the Petition Date, and are and shall be valid, perfected, enforceable and effective as of the Petition Date without any further action of the Debtors or the Administrative Agent and Secured Lender and without the necessity of the execution, filing or recording of any financing statements, security agreements, mortgages, or other documents, or of obtaining control agreements over bank accounts.<br><br>(c)  The Administrative Agent and Secured Lender shall have an administrative claim with a priority equivalent to a claim under Sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, on a dollar-for-dollar basis for and solely to the extent of any Diminution in Value, which administrative claim shall, among other things, have priority over all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code (the "Super-Priority Administrative Claim"), except for expenditures constituting the Carve-Out.<br><br>Furthermore, the Debtors shall continue to operate the Debtors' businesses, and in doing so, shall preserve the value of the Debtors' estate. |
| **Carve-Out** | The Replacement Liens and Super-Priority Administrative Claim granted by the Interim Order shall be junior and subordinate to the following fees and expenses (the "Carve-Out"): (a) all accrued but unpaid fees and expenses (the "Professional Fees and Expenses") of the attorneys, accountants or other professionals retained by the Debtors under section 327 of the Bankruptcy Code (collectively, the "Professionals"), allocable to the Debtors' Professionals on a pro rata basis under and to the extent set forth in the Budget and incurred prior to the delivery of a Termination Notice; (b) Professional Fees and Expenses in the amount of $100,000 incurred after delivery of a Termination Notice; and (c) the payment of fees pursuant to 28 U.S.C. § 1930 to the extent related to these chapter 11 cases of the Debtors, provided that all such fees and expenses shall be subject to approval by a final order of the Court pursuant to sections 326, 328, 330, 331 or 363 of the Bankruptcy Code.  Notwithstanding anything to the contrary set forth herein, no Cash Collateral nor any portion of the Carve-Out |

<table>
<tr><td></td><td>may be used to prosecute actions, claims, demands or causes of action against the Administrative Agent and Secured Lender, or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the Administrative Agent and Secured Lender's liens and security interests against the Prepetition Collateral or the Replacement Lien.</td></tr>
</table>

21.    The foregoing is only a brief summary.  The terms of the Debtors' use of Cash Collateral are set forth in detail in the attached Interim Order.  **In the event of any inconsistency between the above summary and the Interim Order, the terms of the Interim Order shall control.  Interested parties should review the Interim Order for a complete and accurate understanding**.

22.    Local Rule 4001-2 requires that certain provisions contained in motions requesting the use of cash collateral be highlighted.  In accordance therewith, the Debtors highlight the following:

(a)    Local Rule 4001-2(a)(i)(B) requires the Debtors to highlight provisions or findings of fact that bind the estates or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor.  Paragraphs D and E of the Interim Order contain findings of fact, and Paragraph 7 of the Interim Order contains provisions, that bind the Debtors and their estates in this regard; however, under Paragraph 7 of the Interim Order, all parties other than the Debtors have 75 days from the Petition Date to file an adversary proceeding or contested matter challenging such acknowledgments and agreements.

(b)    Local Rule 4001-2(a)(1)(H) requires the Debtors to highlight provisions that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code.  While Paragraphs H and 13 of the Interim Order do not provide for the waiver of such rights, it does provide for such rights to upon entry of a final order.

23.    Other than as set forth in the foregoing paragraph, the Debtors do not believe that the Interim Order contains any other provisions requiring special disclosure under Local Rule 4001-2.

01:14129669.1

24.    The relief requested herein is in the best interests of the Debtors, their estates and creditors.  Absent such relief, the Debtors will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

## Basis For Relief

### A.    Legal Standard

25.    The Debtors' use of property of their estates is governed by Bankruptcy Code Section 363, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

26.    Bankruptcy Code Section 363(c)(2)(B) permits a debtor to use cash collateral with the consent of this Court.  Bankruptcy Code Section 363(e) requires a debtor to adequately protect the secured creditors' interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during the Chapter 11 case.

27.    What constitutes sufficient adequate protection is decided on a case-by-case basis. See In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984); In re Swedeland Dev. Group. Inc., 16 F.3d 552, 564 (3d Cir. 1994); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Columbia Gas Sys., Inc., 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992).  By requiring adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in its collateral during the period of use by the debtor in possession.  See In re Glasstream Boats, Inc., 110 B.R.

611, 613 (Bankr. M.D.Ga. 1990); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr.

S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re

Hubbard Power & Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).  Adequate protection can come

in various forms, including payment of adequate protection fees, payment of interest, granting of

replacement liens and administrative claims.

**B.    The Debtors Have a Vital Need to Access Cash Collateral Immediately**

28.    A debtor's cash "is the life's blood of the business," and the bankruptcy court

must ensure that cash "is available for use even if to a limited extent." In re Mickler, 9 B.R. 121,

123 (Bankr. M.D. Fla. 1981).   Courts typically authorize a debtor to use cash collateral to

continue its operations so long as the interest asserted by any affected secured creditor in such

cash collateral is adequately protected.  Thus, courts are required to balance the debtor's need to

use cash collateral in its reorganization effort against the secured creditor's need for adequate

protection.  Stein v. U.S. Farmers Home Admin. (In re Stein), 19 B.R. 458, 459 (Bankr. E.D. Pa.

1982).  In ruling whether a secured creditor is adequately protected early in a case, courts "will

generally permit the business operation to continue, at least to the point of plan formulation, if

the debtors make a solid evidentiary showing to support their projections . . . ." In re Dynaco

Corp., 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

29.    Consistent with these principles, courts repeatedly have recognized that use of

cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and

thus maximize the value of an estate for all interested parties.  See, e.g., Dynaco, 162 B.R. at 394

(granting a motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to

rehabilitate debtors and generally access to cash collateral is necessary in order to operate a

business"); George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d at 1020 (allowing debtor to use

cash collateral over secured creditor's objection after noting that "[w]ithout the availability of

cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); (In re O'Connor), 808 F.2d at 1399 (permitting debtor to use cash collateral after finding that there was only a low risk that secured creditor's interest would diminish).

30.    Here, the Debtors have a vital need to use Cash Collateral.  Without access to Cash Collateral, the Debtors may not be able to provide regular services to the residents and pay vendors, employee wages and similar expenses.  The Debtors' inability to do any of these would cause immediate and irreparable harm to their estates.

31.    The alternative to allowing access to the Cash Collateral is "to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of _all_ classes of creditors and other constituencies involved in this case."    Dynaco Corp., 162 B.R. at 396 (emphasis in original).  This harsh outcome would be catastrophic and would stand in diametrical opposition to the rehabilitative purpose of Chapter 11.

32.    The Debtors' ability to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the use of Cash Collateral is vital.  Without use of the Cash Collateral, the Debtors will have insufficient ability to operate their businesses.  If their business is ceased, then immediate and irreparable harm will be caused to the Debtors and the residents of the communities.  The residents will not be able to obtain the necessary care and assistance that they require, and they will be forced to move, thereby significantly risking their lives and health.   The Debtors, therefore, seek immediate authority to use the Cash Collateral as set forth in the motion and in the Interim Order to prevent immediate and irreparable harm to their estate pending a final hearing pursuant to Bankruptcy Rule 4001(c).

01:14129669.1

33.     Accordingly, as the Debtors require the use of Cash Collateral, they submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate Cash Collateral availability.

**C.     The Secured Lender is Adequately Protected**

34.     As noted above, a debtor's authority to use Cash Collateral is typically conditioned on providing "adequate protection" to secured creditors that assert an interest in such cash.  "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in [Bankruptcy Code Section 361 of the Bankruptcy Code]."  In re Beker Industrial Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  Section 361 identifies various types of adequate protection, including cash payments, additional liens, replacement liens and such other relief that will result in the realization by the secured creditor of the "indubitable equivalent" of its interest in its collateral.  11 U.S.C. § 361.

35.     The determination of adequate protection is a fact-specific inquiry that is to be made on a case-by-case basis.  See, e.g., MBank, 808 F.2d at 1396-97 (the determination is a question of fact "which is to be decided flexibly on the proverbial 'case-by-case' basis") (citing Martin, 761 F.2d at 474); Mosello, 195 B.R. at 289 (the determination "is left to the vagaries of each case").  See also In re Royal d'Iberville Corp., 10 B.R. 37, 39 (Bankr. S.D. Miss. 1981) ("Opinions as to what is adequate protection must be determined on a case-by-case basis and opinions will vary greatly from court-to-court because adequate protection is not defined in the Bankruptcy Code.").  Furthermore, in determining adequate protection, "[t]he equities in each case must be weighed in striking a balance."  Stein, 19 B.R. at 459.

36.     The focus of the adequate protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the value of its collateral during the reorganization process.  See Mosello, 195 B.R.

at 288; <u>Beker</u>, 58 B.R. at 736.  <u>See also</u> <u>In re WorldCom, Inc.</u>, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for Section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under Section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy.").

37.     Here, the adequate protection proposed by the Debtors will fully protect the Secured Lender:

(a)     The Debtors propose to provide the Administrative Agent and Secured Lender with the Replacement Liens upon all assets and property of the Debtor and its estate of any kind or nature whatsoever, now existing or hereafter acquired, including, without limitation, the Prepetition Collateral, but excluding all claims and causes of action, and the products and proceeds thereof, arising under or permitted by Sections 502(d), 506(c), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance claims and causes of action arising under state or federal law; provided, however, that the Replacement Liens shall be subject and subordinate to (a) the Carve-Out and (b) the Prior Senior Liens (as defined in the Interim Order).

(b)     The Debtors propose to provide the Administrative Agent and Secured Lender with a Superpriority Claim for the benefit of the holders of the Bonds as provided in Bankruptcy Code Section 507(b), except that the Superpriority Claim shall not have priority over expenditures constituting the Carve-Out.

38.     Furthermore, the Debtors shall continue to operate their businesses, and in doing so, shall preserve the value of the Collateral.

39.     Based on the foregoing, the Debtors submit that the proposed adequate protection will fully protect the Secured Lender from any diminution in the value of its interest in the Cash Collateral and is fair, reasonable and sufficient to satisfy the requirements of the Bankruptcy Code.  Accordingly, the adequate protection proposed herein and in the Interim Order is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code Sections 363(c)(2) and (e).  Moreover, courts in this district have granted similar relief in other recent Chapter 11 cases.

See, e.g., In re Landauer Healthcare Holdings, Inc., No. 13-12098 (CSS) (Bankr. D. Del. Sept. 12, 2013) (on a final basis).

**D.    The Requirements of Bankruptcy Rules 4001(b)(2) and 6003(b) Have Been Satisfied**

40.    Pursuant to Bankruptcy Rule 4001(b)(2), a minimum of 14 days' notice is required before a final hearing on this Motion may take place.  The same rule, however, also provides that the Court "may conduct a preliminary hearing before such 14-day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2).

41.    In addition, Bankruptcy Rule 6003(b) provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition," grant relief upon "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ."  Fed. R. Bankr. P. 6003(b).

42.    As set forth above, the Debtors have an immediate and urgent need to use Cash Collateral.  Absent the use of Cash Collateral, the Debtors will not be able to meet their working capital and liquidity needs, and their estate and creditors will suffer immediate and irreparable harm.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rules 4001(b)(2) and 6003(b) have been satisfied.

**E.    The Carve-Out**

43.    With the inclusion of the Carve-Out, the Cash Collateral Orders do not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  See In re Ames Dept. Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs

01:14129669.1

16

for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). In <u>Ames</u>, the court found such "carve-outs" for professional fees to be not only reasonable, but also necessary to ensure that official committees and debtors' estates can retain assistance from counsel. <u>See</u> <u>id.</u> at 41. The Adequate Protection is expressly subject and subordinated to the Carve-Out, as described above.

**F.      The Court Should Schedule a Final Hearing**

44.      Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court schedule a final hearing on the Motion as soon as practicable, but in no event later than 30 days following the entry of an interim order, and fix the date prior to the final hearing for the filing of objections to the Motion.

<u>**Notice**</u>

45.      Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors; (c) the Senior Loan Borrowers' Secured Lender, ELP West Palm, LLC, and its counsel; (d) Administrative Agent to ELP West Palm, LLC, Trimont Real Estate Advisors, Inc.; (e) Devonshire PGA Holdings, LLC's Mezzanine Lender, HJSI Devonshire II, LLC; (f) counsel to HJSI Devonshire II, LLC; (g) Administrative Agent to HJSI Devonshire II, LLC; (h) counsel for the Resident's Council; (i) the Florida Office of Insurance Regulation; (j) the Centers for Medicare and Medicaid Services; (k) the United States Attorney's Office for the District of Delaware; (l) the Internal Revenue Service; and (m) the Securities and Exchange Commission. The Debtors respectfully submit that no other or further notice of this Motion is required.

01:14129669.1

**No Prior Request**

46.     No previous request for the relief sought herein has been made to this Court or any other court.

**Conclusion**

WHEREFORE, the Debtors request that the Court enter an order, substantially in the form submitted attached hereto as **Exhibit A**, granting the relief requested in this Motion on an interim basis, schedule a final hearing on this Motion and grant such other and further relief as is just and appropriate under the circumstances.

Dated: September 19, 2013          YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware

                                       */s/ M. Blake Cleary*
                                       M. Blake Cleary (No. 3614)
                                       Sean M. Beach (No. 4070)
                                       Robert F. Poppiti, Jr. (No. 5052)
                                       Justin P. Duda (No. 5478)
                                       Rodney Square
                                       1000 North King Street
                                       Wilmington, Delaware 19801
                                       Telephone:  (302) 571-6600
                                       Facsimile:  (302) 571-1253

                                       Proposed Counsel for the Debtors

01:14129669.1

**<u>EXHIBIT A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------x
                                                            :
In re:                                                      :  Chapter 11
                                                            :
DEVONSHIRE AT PGA NATIONAL, LLC,                            :  Case No. 13-12460 (_____)
et al.,[1]                                                  :
                                                            :  (Jointly  Administered)
                                                            :
Debtors.                                                    :
------------------------------------------------------------x  **Ref. Docket No. _____**
```

**INTERIM ORDER (A) AUTHORIZING INTERIM USE OF CASH**
**COLLATERAL, (B) GRANTING ADEQUATE PROTECTION TO**
**SENIOR LENDER AND (C) SCHEDULING A FINAL HEARING**

Upon the motion (the "*Motion*")[2] of the Debtors and Debtors-in-possession in the above-

captioned case (the "*Debtors*"), for an interim order (this "*Order*") (a) authorizing the Debtors to

use the cash collateral of the Senior Lender, (b) granting the Senior Lender adequate protection

upon the terms set forth in interim and final orders, and (c) scheduling a final hearing on the

Motion and approving the form and manner of notice thereof; and it appearing that this Court has

jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that

venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and

this Court having determined that the relief requested in the Motion is in the best interests of the

Debtors, their estate, their creditors and other parties in interest; and it appearing that proper and

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of their taxpayer identification numbers, are: Devonshire PGA Holdings, LLC (2843), Devonshire at PGA National, LLC (2904), Chatsworth at PGA National, LLC (3412) and Chatsworth PGA Properties, LLC (3472).  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 350 Devonshire Way, Palm Beach Garden, FL 33418.

[2]    All capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

adequate notice of the Motion has been given and that no other or further notice is necessary; and

after due deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY FOUND THAT:[3]

A.    On the Petition Date, the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code.

B.    Since the Petition Date, the Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

C.    No Trustee or committee has been appointed in the Debtors' chapter 11 cases.

D.    Subject to entry of a final order, the Debtors stipulate and agree that they are obligated under the following undertakings:

(1)    Mortgage Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Devonshire at PGA National, LLC and Chatsworth PGA Properties, LLC for the benefit of Merrill Lynch Capital dated May 1, 2007;

(2)    Assignment of Liens and Rents among Merrill Lynch Capital, Devonshire at PGA National, LLC and Chatsworth PGA Properties, LLC dated May 1, 2007;

(3)    Conditional Assignment of Management Agreement among Merrill Lynch Capital, Chatworth at PGA National, LLC and SHP Healthcare Services, LLC dated May 1, 2007;

(4)    Conditional Assignment of Management Agreement among Merrill Lynch Capital, Devonshire at PGA National, LLC and SHP Senior Living Services, LLC dated May 1, 2007;

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

01:14129671.1

(5)    Collateral Assignment of Interest Rate Hedge Agreement among Merrill Lynch Capital, Devonshire at PGA National, LLC at Chatsworth PGA Properties, LLC dated May 1, 2007;

(6)    Subordination and Attornment Agreement among Chatworth at PGA National, LLC as tenant and Chatworth PGA Properties LLC as landlord and Merrill Lynch Capital dated May 1, 2007;

(7)    the Credit and Security Agreement dated as of May 1, 2007 (the "Credit Agreement") among Devonshire at PGA National, LLC, Chatsworth PGA Properties, LLC and Chatsworth at PGA National, LLC, as Borrowers (each such party referred to herein as a "Borrower" and collectively as the "Borrowers"), and the Lender parties thereto (each such party and their successors and assigns are referred to herein as a "Lender" and collectively as the "Lenders");

(8)    that certain Promissory Note (Note A), dated as of May 1, 2007, made by the Borrowers, in the original principal amount of $75,000,000 ("Note A");

(9)    that certain Amended and Restated Term Note (Note B-1) dated as of July 25, 2007, made by the Borrowers, in the original principal amount of Twenty Million Dollars ($20,000,000) ("Note B-1");

(10)    that certain Amended and Restated Term Note (Note B-2) dated as of July 2007 (sic), made by the Borrowers in the original principal amount of Twenty Million Dollars ($20,000,000) ("Note B-2");

(11)    that certain Term Note (Note C) dated as of May 1, 2007, made by the Borrowers in the original principal amount of Forty Million Two Hundred Twenty Thousand Dollars ($40,220,000) ("Note C");

(12)    that certain Security Agreement dated as of May 1, 2007 by and between Devonshire Associates, Ltd., the Administrative Agent and the Lenders;

(13)    that certain Ownership Pledge, Assignment and Security Agreement, dated as of May 1, 2007, by and between Devonshire Associates, Ltd., the Administrative Agent and the Lenders;

(14)    that certain Assignment of Rents and Leases, dated as of May 1, 2007 by the Borrowers to the Administrative Agent and the Lenders;

(15)    that certain Environmental Indemnity Agreement, dated as of May 1, 2007, by the Borrowers in favor of the Administrative Agent, for the Lenders;

(16)    that certain Non-Recourse Payment Guaranty, dated as of May 1, 2007, made by Devonshire PGA Holdings, LLC in favor of the Administrative Agent, for the Lenders;

(17)    that certain Guaranty of Non-Recourse Carveouts Agreement, dated as of May 1, 2007, made by Craig E. Anderson, an individual, in favor of the Administrative Agent, for the Lenders;

(18)    that certain Acknowledgement and Subordination Agreement, dated as of May 1, 2007, between U.S. Bank National Association, as Trustee under that certain Indenture of Trust and Mortgage between Devonshire Associates, Ltd. and First Union National Bank of Florida, date as of May 1, 2007, and the Lenders;

(19)    that certain Subordination, Attornment and Non-Disturbance Agreement, dated as of May 1, 2007, between National City Bank, as successor in interest to Fidelity Bank & Trust f/k/a Fidelity Federal Savings Bank of Florida Inc., the Administrative Agent and the Lenders;

(20)    that certain Additional Agreement Regarding Purchase Agreement, dated as of May 1, 2007, between SHP Senior Living Investments, LLC, the Borrowers, and the Administrative Agent for the Lenders;

(21)    that certain Appointment, Assumption and Amendment Agreement, dated as of April 20, 2012, between Devonshire Funding Company, Inc., Landesbank Baden-Württemberg, GE Business Financial Services Inc., Capmark, and the Administrative Agent; and

(22)    that certain Sideletter Agreement, dated as of April 20, 2012, between Devonshire Funding Company, Inc., Landesbank Baden-Württemberg, GE Business Financial Services Inc., Capmark Bank and the Administrative Agent.

The foregoing acknowledgments and stipulations shall be binding on the Debtors but not on any

other party-in-interest in these cases, except as provided in Decretal Paragraph 7 hereof.

E.    Subject to entry of a final order, the Debtors further stipulate and agree as follows:

(1)    As of the Petition Date, the Loan Documents are each valid and enforceable against the Debtors, and the Debtors do not possess and agree not to assert any claim (as such term is defined in Section 101(5) of the Bankruptcy Code), counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability or non-avoidability of the Loan Documents;

(2)    As of the Petition Date, the Prepetition Obligations constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Loan Documents (other than with respect to a stay of enforcement arising from Section 362 of the Bankruptcy Code); no offsets, defenses or counterclaims to any of the Prepetition Obligations exists; no portion of the Prepetition Obligations is subject to avoidance, recharacterization, disallowance, reduction or subordination pursuant to the Bankruptcy Code or non-bankruptcy law; the Prepetition Obligations constitute allowable secured claims; and the Debtors have

irrevocably waived, discharged and released any rights it may have to challenge or object to the Prepetition Obligations, and/or to challenge or object to the security for the Prepetition Obligations;

(3)     The Secured Lenders have asserted liens on and security interests in the Prepetition Collateral.  The Administrative Agent and Secured Lender's liens and security interests with respect to the Prepetition Collateral are valid, enforceable and perfected (by filing financing statements, recording the Deed of Trust and, where necessary, by possession of relevant instruments, certificates or other property), and are not subject to avoidance, recharacterization, disallowance, reduction or subordination pursuant to the Bankruptcy Code or non-bankruptcy law.  All of such financing statements and the Deed of Trust were validly authorized by the Debtors or validly executed by authorized representatives of the Debtors;

(4)     The Administrative Agent and Senior Lender's security interests and liens have attached to all funds and property of the Debtors consisting of the Prepetition Collateral, including the product, issues, rents, profits and other proceeds of the Prepetition Collateral, and the Administrative Agent and Secured Lender's security interests and liens will, notwithstanding the commencement of these chapter 11 cases, as of the Petition Date and thereafter, attach to product, issues, rents, profits and other proceeds of the Prepetition Collateral.  Without limiting the foregoing, the Administrative Agent and Secured Lender's security interests and liens attach to all cash (whether as original collateral or cash proceeds of the Prepetition Collateral), negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents now or hereafter in the possession, custody or control of the Debtors (as defined in Section 363(a) of the Bankruptcy Code, the "*Cash Collateral*").

The foregoing acknowledgments and stipulations shall be binding on the Debtors but not on any other party-in-interest in these cases, except as provided in Decretal Paragraph 7 hereof.

F.     The Debtors have requested that the Administrative Agent and Senior Lender consent to the Debtors' use of Cash Collateral, and the Administrative Agent and Senior Lender are willing to consent to the Debtors' use of Cash Collateral on the terms and conditions provided herein.  The Administrative Agent and Senior Lender are relying on the terms, conditions and protections provided herein in so consenting.

G.     The agreements and arrangements described in the Motion and authorized in this Order have been negotiated at arm's-length with all parties represented by counsel, are fair and reasonable under the circumstances, and are enforceable in accordance with their terms.  The Debtors and the Administrative Agent and Senior Lender are acting in good faith with respect to

the use of Cash Collateral as provided in this Order.  The superpriority claims, security interests and liens and other protections granted to the Administrative Agent and Senior Lender pursuant to this Order will not be affected by any subsequent reversal, modification, vacatur or amendment of this Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.

H.    In light of the Administrative Agent and Senior Lender's agreement to subordinate its liens and superpriority claims to the Carve-Out (defined herein), the Administrative Agent and Senior Lender is entitled, subject to a final order, to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

I.    The liens and security interests granted to the Administrative Agent and Senior Lender hereunder shall not prime or impair any validly perfected lien or security interest senior to the liens and security interests of the Administrative Agent and Senior Lender with respect to the Debtors' assets and properties as of the Petition Date (the "*Prior Senior Liens*").  The granting of the replacement liens, super-priority administrative claims and other agreements of the Debtors hereunder constitute adequate protection to the Administrative Agent and Senior Lender for the Debtors' use of Cash Collateral for purposes of this Order.

J.    Good cause has been shown for entry of this Order.  Without use of Cash Collateral, the Debtors will not be able to fund their day-to-day operations, including payroll for its employees.  Unless the Court authorizes the use of Cash Collateral, the Debtors will be unable to pay for the goods and services necessary to preserve and maximize the value of the Debtors' assets while they attempt to obtain confirmation of their Chapter 11 plan.  Accordingly, this

Order is required to avoid immediate and irreparable harm to the Debtors' estate.  Entry of this

Order is in the best interests of the Debtors, their creditors, and the estate.

THE COURT HEREBY ORDERS, AS FOLLOWS:

1.      The Motion is granted on an interim basis in accordance with the terms and

conditions of this Order.

2.      <u>Use of Cash Collateral</u>.  Subject to the terms and conditions set forth in this

Order, the Debtors are, through and including the earlier of (a) the date of the final hearing on the

Debtors' use of Cash Collateral or (b) termination of this Order following issuance of a

Termination Notice as set forth in Paragraph 10 below, authorized pursuant to Bankruptcy Code

Sections 105, 361, 362 and 363, and Bankruptcy Rules 2002, 4001, 6003 and 9014 to use Cash

Collateral on an interim basis pending a final determination by the Court.  The Cash Collateral

may only be used to fund the types and corresponding amounts of itemized expenditures

contained in the budget attached hereto as <u>Exhibit A</u> (the "*Budget*"); <u>provided</u>, <u>however</u>, that the

Debtors may use Cash Collateral in excess of the amount designated for a particular line-item so

long as the percentage of deviation for all line-items during any rolling 4-week period does not

exceed ten percent (10%), in aggregate (the "*Variance*"); and <u>provided</u> <u>further</u> that any

amendment or modification of the terms and conditions, or any amendment, modification, roll-

forward or replacement of the Budget itself, shall be subject to the prior written consent of the

Administrative Agent and Senior Lender.  Any unused portion of the Variance will carry over to

the following rolling 4-week period.

3.      <u>Reporting</u>.  The Debtors will submit to the Administrative Agent and Senior

Lender on each consecutive Wednesday during the chapter 11 cases an updated rolling 13 week

cash flow report in a form acceptable to the Administrative Agent and Senior Lender comparing

01:14129671.1

- 7 -

actual results to the Budget and reporting on the Variance of actual cash inflows and outflows from those set forth in the Budget.

4.     <u>Adequate Protection; Replacement Liens</u>.  The Administrative Agent and Senior Lender are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including, but not limited to, the Cash Collateral, for any diminution in value of its interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the Debtors' use of Cash Collateral and any other Prepetition Collateral and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code.  As security for and solely to the extent of any diminution in the value of the Administrative Agent and Senior Lender's Prepetition Collateral from and after the Petition Date, calculated in accordance with Bankruptcy Code Section 506(a) (a "*Diminution in Value*"), the Administrative Agent and Senior Lender are hereby granted senior priority replacement liens upon all assets and property of the Debtors and their estates of any kind or nature whatsoever, now existing or hereafter acquired, including, without limitation, the Prepetition Collateral (the "*Replacement Liens*"), but excluding all claims and causes of action, and the products and proceeds thereof, arising under or permitted by Sections 502(d), 506(c), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance claims and causes of action arising under state or federal law.  The Replacement Liens so granted are in addition to all security interests, liens, and rights of setoff existing in favor of the Administrative Agent and Senior Lender on the Petition Date, and are and shall be valid, perfected, enforceable and effective as of the Petition Date without any further action of the Debtors or the Administrative Agent and Senior Lender and without the necessity of the execution, filing or

recording of any financing statements, security agreements, mortgages, or other documents, or of obtaining control agreements over bank accounts.

5.     <u>Adequate Protection; 507(b) Priority Claim</u>.    The Administrative Agent and Senior Lender are hereby granted an administrative claim with a priority equivalent to a claim under Sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, on a dollar-for-dollar basis for and solely to the extent of any Diminution in Value, which administrative claim shall, among other things, have priority over all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code (the "*Super-Priority Administrative Claim*"), except for expenditures constituting the Carve-Out.

6.     <u>Carve-Out</u>.    The Replacement Liens and Super-Priority Administrative Claim granted hereunder shall be junior and subordinate to the following fees and expenses (the "*Carve-Out*"):    (a) all accrued but unpaid fees and expenses (the "*Professional Fees and Expenses*") of the attorneys, accountants or other professionals retained by the Debtors under section 327 of the Bankruptcy Code (collectively, the "*Professionals*"), allocable to the Debtors' Professionals on a pro rata basis under and to the extent set forth in the Budget and incurred prior to the delivery of a Termination Notice; (b) Professional Fees and Expenses in the amount of $100,000 incurred after delivery of a Termination Notice; and (c) the payment of fees pursuant to 28 U.S.C. § 1930 to the extent related to the chapter 11 cases of the Debtors, provided that all such fees and expenses shall be subject to approval by a final order of the Court pursuant to Sections 326, 328, 330, 331 or 363 of the Bankruptcy Code.    Notwithstanding anything to the contrary set forth herein, no Cash Collateral nor any portion of the Carve-Out may be used to prosecute actions, claims, demands or causes of action against the Administrative Agent and

01:14129671.1

Senior Lender, or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the Administrative Agent and Senior Lender's liens and security interests against the Prepetition Collateral or the Replacement Lien.

7.    Parties in Interest Bound.

(a)    The admissions and stipulations contained in Paragraphs C and D of this Order shall be binding on the Debtors and shall be binding upon all other parties in interest, including, without limitation, any Committee and any Chapter 7 or Chapter 11 Administrative Agent and Senior Lender that may be appointed or elected on behalf of the estates of the Debtors, except to the extent that (i) a party in interest has filed an adversary proceeding or contested matter challenging the validity, enforceability or priority of the Prepetition Debt or the liens on the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action against the Administrative Agent and Senior Lender on behalf of the Debtors' estates, no later than the date that is seventy-five (75) days after the Petition Date and (ii) the Court rules in favor of the plaintiff in any such timely filed adversary proceeding or contested matter. If any such adversary proceeding or contested matter is timely commenced as of such date, the admissions contained in this Order shall nonetheless remain binding and preclusive (as provided in this paragraph) except to the extent that such acknowledgments and agreements are expressly challenged in such adversary proceeding or contested matter.

(b)    If no such adversary proceeding or contested matter is commenced as of such date, then (i) the Prepetition Obligations shall constitute allowed secured claims, not subject to subordination (other than as set forth herein with respect to the Carve-Out), or avoidance, for all purposes in these chapter 11 cases and any subsequent chapter 7 cases, (ii) the liens securing the Prepetition Obligations on the Prepetition Collateral shall be deemed legal, valid, binding,

01:14129671.1

duly authorized, perfected, not subject to defense, counterclaim, recharacterization, offset of any kind, subordination, other than as set forth herein, and otherwise unavoidable, (iii) the Prepetition Obligations and the liens on the Prepetition Collateral shall not be subject to any other or further challenge by any party-in-interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto, and (iv) the Administrative Agent and Senior Lender shall be deemed released from any and all rights, claims, causes of action and liabilities arising from or in connection with the Prepetition Obligations, the Prepetition Collateral, the Loan Documents and/or the extension of credit or other financial accommodations thereunder or with respect thereto.

8.    <u>Events of Default</u>.  Each of the following shall constitute an event of default ("*Event of Default*") with respect to the Debtors' authorization to use Cash Collateral hereunder, unless otherwise waived in writing by the Administrative Agent and Senior Lender:

(a)    entry of an order converting these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code;

(b)    entry of an order dismissing these chapter 11 cases;

(c)    entry of an order appointing or directing the election of a Trustee under Section 1104 of the Bankruptcy Code or an examiner under Section 1106(b) for any of the Debtors;

(d)    without the prior written consent of the Administrative Agent and Senior Lender, the entry of any order (or other judicial action which has the effect of) amending, reversing, supplementing, staying the effectiveness of, vacating, or otherwise modifying this Order;

(e)    the Debtors use Cash Collateral for any purpose or in a manner other than as permitted in this Order and in the Budget or otherwise fails to comply with any term of this Order;

(f)    entry of an order by the Bankruptcy Court authorizing relief from stay by any person (other than the Administrative Agent and Senior Lender) on or with respect to all or any portion of the Prepetition Collateral with a value in excess of $50,000;

(g)     the filing by the Debtors of any pleading objecting to or seeking to challenge the Administrative Agent and Senior Lender's claims with respect to the Prepetition Obligations or the Administrative Agent and Senior Lender's lien upon Cash Collateral or the Prepetition Collateral or otherwise asserting rights, claims or causes of action against the Administrative Agent and Senior Lender with respect to the Prepetition Obligations;

(h)     the breach by the Debtors of their obligation under this Order;

(i)     the filing by the Debtors of any debtors-in-possession financing pleadings or any final documents pertaining to a debtor-in-possession financing not acceptable to and not supported by the Administrative Agent and Senior Lender;

(j)     the filing by the Debtors of any bid procedure and/or sale documents relating to the sale of the Prepetition Collateral, post-petition collateral subject to the Replacement Lien, and/or Cash Collateral not acceptable to and not supported by Senior Lender; or

(k)     the Debtors voluntarily or involuntarily dissolve or are dissolved, liquidated or are liquidated or cease the operation of any material portion of its business.

9.     <u>Termination Notice</u>.  Immediately upon the occurrence or existence of an Event of Default, the Administrative Agent and Senior Lender shall be authorized to issue a notice (a "*Termination Notice*") thereof to the Debtors, their counsel, counsel to any Committee and the U.S. Trustee, which Termination Notice may be delivered by electronic mail or facsimile. Unless, within five (5) business days after the issuance of such notice, the Court determines that the applicable Event of Default has not occurred or does not exist, the Debtor's authority to use Cash Collateral shall terminate.

10.     <u>No Duty to Monitor Compliance</u>.    The Administrative Agent and Senior Lender may assume that the Debtors will comply with all terms and conditions of this Order and the Budget and shall not (a) be obligated to ensure or monitor the Debtors' compliance with any financial covenants, formulae or other terms and conditions of this Order or the Loan Documents, (b) be obligated to pay (directly or indirectly from Cash Collateral or otherwise) any expenses incurred or authorized to be incurred pursuant to this Order or in connection with the

01:14129671.1

- 12 -

operation of the Debtors' business, or (c) be obligated to ensure or monitor that Cash Collateral exists to pay such expenses.

11.     No Waiver.  The failure of the Administrative Agent and Senior Lender to seek relief or otherwise exercise its rights and remedies under this Order or the Loan Documents, as applicable, shall not constitute a waiver of any of the rights of the Administrative Agent and Senior Lender's rights hereunder, thereunder or otherwise.

12.     No Third Party Rights.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holders or any direct, indirect or incidental beneficiary.

13.     Section 552(b).  In light of its agreement to subordinate its liens and superpriority claims to the Carve-Out, the Administrative Agent and Senior Lender shall be entitled, subject to a final order, to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Administrative Agent and Senior Lender with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

14.     Effect of Order.  This Order shall be effective upon its entry and not subject to any stay (notwithstanding anything to the contrary contained in the Bankruptcy Rules, including Bankruptcy Rule 4001(a)(3)).  The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered (a) confirming any plan of reorganization; (b) dismissing these chapter 11 cases; (c) converting these chapter 11 cases to any other Chapter under the Bankruptcy Code; (d) withdrawing of the references of these Chapter 11 cases from the Court; and (e) providing for abstention from handling or retaining of jurisdiction of these Chapter 11 cases in the Court.

15.     <u>Amendments and Waivers</u>.  The Debtors and the Administrative Agent and Senior Lender may amend, modify, supplement or waive any provision of this Order in writing if such amendment, modification, supplement or waiver is not material, without any need to apply to, or receive further approval from, the Court.   The Debtors shall provide notice of any such nonmaterial amendment, modification, supplement or waiver to counsel for any official committee of creditors appointed in these cases, the Office of the United States Trustee, Administrative Agent and Senior Lender.  Any material amendment, modification, supplement or waiver shall be in writing, signed by the Debtors, the Administrative Agent and Senior Lender, and approved by the Court on appropriate notice by the Debtors.

16.     <u>Order Governs</u>.  In the event of any inconsistency between the provisions of this Order and the Motion, the provisions of this Order shall govern.

17.     <u>Final Hearing</u>.  A final hearing on the Motion will be scheduled for September ___, 2013, at _____ p.m. (the "*Final Hearing*").  The Debtors will provide notice of the Final Hearing by first class mail upon (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors; (c) the Senior Loan Borrowers' Secured Lender, ELP West Palm, LLC, and its counsel; (d) Administrative Agent to ELP West Palm, LLC, Trimont Real Estate Advisors, Inc.; (e) Devonshire PGA Holdings, LLC's Mezzanine Lender, HJSI Devonshire II, LLC; (f) counsel to HJSI Devonshire II, LLC; (g) Administrative Agent to HJSI Devonshire II, LLC; (h) counsel for the Resident's Council; (i) the Florida Office of Insurance Regulation; (j) the Centers for Medicare and Medicaid Services; (k) the United States Attorney's Office for the District of Delaware; (l) the Internal Revenue Service; and (m) the Securities and Exchange Commission.  If no objections are filed and served

on or before the Objection Deadline, at the Final Hearing, the Court may enter a final order

permitting the use of cash collateral by the Debtors.

Dated: September _____, 2013
Wilmington, Delaware

_____
United States Bankruptcy Judge

# EXHIBIT A

**CASH COLLATERAL BUDGET**

DRAFT - SUBJECT TO CHANGE

PRIVILEGED AND CONFIDENTIAL

**Consolidated 13 Week Cash Collateral Forecast**

| | Forecast Week Ended Friday 9/27/13 | Forecast Week Ended Friday 10/4/13 | Forecast Week Ended Friday 10/11/13 | Forecast Week Ended Friday 10/18/13 | Forecast Week Ended Friday 10/25/13 | Forecast Week Ended Friday 11/1/13 | Forecast Week Ended Friday 11/8/13 | Forecast Week Ended Friday 11/15/13 | Forecast Week Ended Friday 11/22/13 | Forecast Week Ended Friday 11/29/13 | Forecast Week Ended Friday 12/6/13 | Forecast Week Ended Friday 12/13/13 | Forecast Week Ended Friday 12/20/13 | 13 Week Total WE 9/27/2013 12/20/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow** | | | | | | | | | | | | | | |
| Beginning Book Cash Balance [1] | $ 5,012,816 | $ 5,151,472 | $ 5,105,781 | $ 4,544,665 | $ 4,667,825 | $ 4,774,135 | $ 4,844,908 | $ 4,426,811 | $ 4,645,318 | $ 4,454,128 | $ 4,732,634 | $ 4,081,631 | $ 4,360,138 | $ 5,012,816 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Medicare | 762,773 | 381,386 | - | 381,386 | 762,773 | 381,386 | - | 381,386 | 762,773 | 381,386 | - | 381,386 | 381,386 | 4,958,023 |
| Private Pay / Credit Card Receipts | 95,347 | 238,366 | 95,347 | - | - | 95,347 | 238,366 | 95,347 | - | 95,347 | 190,693 | 95,347 | - | 1,239,506 |
| **Total Cash Receipts** | 858,119 | 619,753 | 95,347 | 381,386 | 762,773 | 476,733 | 238,366 | 476,733 | 762,773 | 476,733 | 190,693 | 476,733 | 381,386 | 6,197,528 |
| **Cash Disbursements - Operating** | | | | | | | | | | | | | | |
| Payroll | 372,550 | - | 372,550 | - | 372,550 | - | 372,550 | - | 372,550 | - | 372,550 | - | 372,550 | 2,607,848 |
| Benefits | 85,686 | - | 85,686 | - | 85,686 | - | 85,686 | - | 85,686 | - | 85,686 | - | 85,686 | 599,805 |
| Ordinary Course Professionals | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 202,740 |
| Utility | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 196,150 |
| Medical Care | 155,981 | 155,981 | 155,981 | 215,981 | 155,981 | 155,981 | 155,981 | 215,981 | 155,981 | 155,981 | 155,981 | 155,981 | 215,981 | 2,207,752 |
| Taxes | - | 286,984 | - | - | - | - | - | - | - | - | - | - | - | 286,984 |
| Trade Payables | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 150,304 |
| **Total Cash Operating Disbursements** | 656,463 | 485,211 | 656,463 | 258,227 | 656,463 | 198,227 | 656,463 | 258,227 | 656,463 | 198,227 | 656,463 | 198,227 | 716,463 | 6,251,583 |
| **Net Operating Cash Flow** | 201,657 | 134,542 | (561,116) | 123,160 | 106,310 | 278,506 | (418,096) | 218,506 | 106,310 | 278,506 | (465,770) | 278,506 | (335,076) | (54,055) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | |
| Utility Deposits | 63,000 | - | - | - | - | - | - | - | - | - | - | - | - | 63,000 |
| Debtor Counsel | - | - | - | - | - | - | - | - | 170,000 | - | - | - | 130,000 | 300,000 |
| Debtor FA | - | - | - | - | - | - | - | - | 110,000 | - | - | - | 90,000 | 200,000 |
| Ombudsman & Counsel | - | - | - | - | - | - | - | - | 17,500 | - | - | - | 14,500 | 32,000 |
| UCC Counsel & FA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee | - | 10,000 | - | - | - | - | - | - | - | - | - | - | - | 10,000 |
| Claims Agent | - | - | - | - | - | 37,500 | - | - | - | - | 15,000 | - | - | 52,500 |
| **Total Restructuring Disbursements** | 63,000 | 10,000 | - | - | - | 37,500 | - | - | 297,500 | - | 15,000 | - | 234,500 | 657,500 |
| **Other Disbursements** | | | | | | | | | | | | | | |
| Management Fees | - | 124,094 | - | - | - | 124,094 | - | - | - | - | 124,094 | - | - | 372,283 |
| Rent | - | 46,139 | - | - | - | 46,139 | - | - | - | - | 46,139 | - | - | 138,417 |
| **Total Other Disbursements** | - | 170,233 | - | - | - | 170,233 | - | - | - | - | 170,233 | - | - | 510,700 |
| **Financing Disbursements** | | | | | | | | | | | | | | |
| **Total Financing Disbursements** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | 138,657 | (45,691) | (561,116) | 123,160 | 106,310 | 70,773 | (418,096) | 218,506 | (191,190) | 278,506 | (651,003) | 278,506 | (569,576) | (1,222,254) |
| **Ending Book Cash Balance** | $ 5,151,472 | $ 5,105,781 | $ 4,544,665 | $ 4,667,825 | $ 4,774,135 | $ 4,844,908 | $ 4,426,811 | $ 4,645,318 | $ 4,454,128 | $ 4,732,634 | $ 4,081,631 | $ 4,360,138 | $ 3,790,561 | $ 3,790,561 |
| Plus: Outstanding Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Cash Balance** | $ 5,151,472 | $ 5,105,781 | $ 4,544,665 | $ 4,667,825 | $ 4,774,135 | $ 4,844,908 | $ 4,426,811 | $ 4,645,318 | $ 4,454,128 | $ 4,732,634 | $ 4,081,631 | $ 4,360,138 | $ 3,790,561 | $ 3,790,561 |

Note [1]: Most recent cash balance available per 7/31 reported B.S.

SUBJECT TO FRE 408

**<u>EXHIBIT B</u>**

**Budget**

DRAFT - SUBJECT TO CHANGE

PRIVILEGED AND CONFIDENTIAL

**Consolidated 13 Week Cash Collateral Forecast**

| | Forecast Week Ended Friday 9/27/13 | Forecast Week Ended Friday 10/4/13 | Forecast Week Ended Friday 10/11/13 | Forecast Week Ended Friday 10/18/13 | Forecast Week Ended Friday 10/25/13 | Forecast Week Ended Friday 11/1/13 | Forecast Week Ended Friday 11/8/13 | Forecast Week Ended Friday 11/15/13 | Forecast Week Ended Friday 11/22/13 | Forecast Week Ended Friday 11/29/13 | Forecast Week Ended Friday 12/6/13 | Forecast Week Ended Friday 12/13/13 | Forecast Week Ended Friday 12/20/13 | 13 Week Total WE 9/27/2013 12/20/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow** | | | | | | | | | | | | | | |
| Beginning Book Cash Balance[1] | $ 5,012,816 | $ 5,151,472 | $ 5,105,781 | $ 4,544,665 | $ 4,667,825 | $ 4,774,135 | $ 4,844,908 | $ 4,426,811 | $ 4,645,318 | $ 4,454,128 | $ 4,732,634 | $ 4,081,631 | $ 4,360,138 | $ 5,012,816 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Medicare | 762,773 | 381,386 | - | 381,386 | 762,773 | 381,386 | - | 381,386 | 762,773 | 381,386 | - | 381,386 | 381,386 | 4,958,023 |
| Private Pay / Credit Card Receipts | 95,347 | 238,366 | 95,347 | - | - | 95,347 | 238,366 | 95,347 | - | 95,347 | 190,693 | 95,347 | - | 1,239,506 |
| **Total Cash Receipts** | 858,119 | 619,753 | 95,347 | 381,386 | 762,773 | 476,733 | 238,366 | 476,733 | 762,773 | 476,733 | 190,693 | 476,733 | 381,386 | 6,197,528 |
| **Cash Disbursements - Operating** | | | | | | | | | | | | | | |
| Payroll | 372,550 | - | 372,550 | - | 372,550 | - | 372,550 | - | 372,550 | - | 372,550 | - | 372,550 | 2,607,848 |
| Benefits | 85,686 | - | 85,686 | - | 85,686 | - | 85,686 | - | 85,686 | - | 85,686 | - | 85,686 | 599,805 |
| Ordinary Course Professionals | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 15,595 | 202,740 |
| Utility | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 15,088 | 196,150 |
| Medical Care | 155,981 | 155,981 | 155,981 | 215,981 | 155,981 | 155,981 | 155,981 | 215,981 | 155,981 | 155,981 | 155,981 | 155,981 | 215,981 | 2,207,752 |
| Taxes | - | 286,984 | - | - | - | - | - | - | - | - | - | - | - | 286,984 |
| Trade Payables | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 11,562 | 150,304 |
| **Total Cash Operating Disbursements** | 656,463 | 485,211 | 656,463 | 258,227 | 656,463 | 198,227 | 656,463 | 258,227 | 656,463 | 198,227 | 656,463 | 198,227 | 716,463 | 6,251,583 |
| **Net Operating Cash Flow** | 201,657 | 134,542 | (561,116) | 123,160 | 106,310 | 278,506 | (418,096) | 218,506 | 106,310 | 278,506 | (465,770) | 278,506 | (335,076) | (54,055) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | |
| Utility Deposits | 63,000 | - | - | - | - | - | - | - | - | - | - | - | - | 63,000 |
| Debtor Counsel | - | - | - | - | - | - | - | - | 170,000 | - | - | - | 130,000 | 300,000 |
| Debtor FA | - | - | - | - | - | - | - | - | 110,000 | - | - | - | 90,000 | 200,000 |
| Ombudsman & Counsel | - | - | - | - | - | - | - | - | 17,500 | - | - | - | 14,500 | 32,000 |
| UCC Counsel & FA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee | - | 10,000 | - | - | - | - | - | - | - | - | - | - | - | 10,000 |
| Claims Agent | - | - | - | - | - | 37,500 | - | - | - | - | 15,000 | - | - | 52,500 |
| **Total Restructuring Disbursements** | 63,000 | 10,000 | - | - | - | 37,500 | - | - | 297,500 | - | 15,000 | - | 234,500 | 657,500 |
| **Other Disbursements** | | | | | | | | | | | | | | |
| Management Fees | - | 124,094 | - | - | - | 124,094 | - | - | - | - | 124,094 | - | - | 372,283 |
| Rent | - | 46,139 | - | - | - | 46,139 | - | - | - | - | 46,139 | - | - | 138,417 |
| **Total Other Disbursements** | - | 170,233 | - | - | - | 170,233 | - | - | - | - | 170,233 | - | - | 510,700 |
| **Financing Disbursements** | | | | | | | | | | | | | | |
| **Total Financing Disbursements** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | 138,657 | (45,691) | (561,116) | 123,160 | 106,310 | 70,773 | (418,096) | 218,506 | (191,190) | 278,506 | (651,003) | 278,506 | (569,576) | (1,222,254) |
| **Ending Book Cash Balance** | $ 5,151,472 | $ 5,105,781 | $ 4,544,665 | $ 4,667,825 | $ 4,774,135 | $ 4,844,908 | $ 4,426,811 | $ 4,645,318 | $ 4,454,128 | $ 4,732,634 | $ 4,081,631 | $ 4,360,138 | $ 3,790,561 | $ 3,790,561 |
| Plus: Outstanding Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Bank Cash Balance** | $ 5,151,472 | $ 5,105,781 | $ 4,544,665 | $ 4,667,825 | $ 4,774,135 | $ 4,844,908 | $ 4,426,811 | $ 4,645,318 | $ 4,454,128 | $ 4,732,634 | $ 4,081,631 | $ 4,360,138 | $ 3,790,561 | $ 3,790,561 |

Note [1]: Most recent cash balance available per 7/31 reported B.S.

SUBJECT TO FRE 408