**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------------------x
                                              :
In re:                                        :  Chapter 11
                                              :
DEVONSHIRE PGA HOLDINGS, LLC,                 :  Case No. 13-12460 (CSS)
et al.,¹                                      :
                                              :  (Jointly Administered)
Debtors.                                      :
                                              :  Hearing Date: October 16, 2013 at 11:00 a.m.
-----------------------------------------------------------------x  Objection Deadline: October 9, 2013 at 4:00 p.m.
```

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER APPROVING
THE SETTLEMENT AGREEMENT, AUTHORIZING REJECTION OF
CERTAIN AGREEMENTS AND RESOLVING CLAIMS RELATING THERETO**

By this motion (the "Motion"), Devonshire PGA Holdings, LLC ("Holdings"),

Devonshire at PGA National, LLC ("Devonshire at PGA"), Chatsworth at PGA National, LLC

("Chatsworth at PGA") and Chatsworth PGA Properties, LLC ("Chatsworth Properties" and

together with Holdings, Devonshire at PGA and Chatsworth at PGA, the "Debtors")

respectfully move the Court pursuant to sections 105(a), 363 and 365 of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 6004, 6006 and 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for the entry of an order, substantially in the

form attached hereto as Exhibit A (the "Proposed Order"): (i) approving the settlement

embodied in the agreement attached as Exhibit 1 to the Proposed Order (the "Agreement" or

"Settlement Agreement") by and among the (a) Debtors, (b) SHP Health Care Services, LLC

("SHP Health Care"), (c) SHP Senior Living Services, LLC ("SHP Senior Living"), (d) SHP

---

¹   The Debtors are the following four entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Devonshire PGA Holdings, LLC (2843), Devonshire at PGA National, LLC (2904), Chatsworth at PGA National, LLC (3412) and Chatsworth PGA Properties, LLC (3472).  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 100 Devonshire Way, Palm Beach Gardens, FL 33418.

Employment Services, LLC ("SHP Employment" and together with SHP Health Care and SHP Senior Living, "SHP"), (e) CA Capital, LLC ("CAC"), the previous manager of each of the Debtors, (f) SHP Senior Living Investments, LLC, the previous owner of 100% of the limited liability company interests in Holdings ("SHP Investments"), (g) Craig E. Anderson, the former principal of the Debtors ("Anderson"), (h) Redwood Capital Investments, LLC, an indirect parent of the Debtors' senior lenders ("Redwood"), (i) HJ Sims Investments, LLC, an indirect parent of the holder of 100% of the limited liability company interests in Holdings ("Sims"), (j) HJSI Devonshire II, LLC, the holder of 100% of the limited liability company interests in Holdings and manager of each of the Debtors ("HJSI-II"), (k) HJSI Devonshire, LLC, the administrative agent under that certain Credit and Security Agreement with Merrill Lynch Capital, as amended and subsequently transferred to HJSI-II ("HJSI"), (l) ELP West Palm, LLC ("ELP") the senior lender under that certain Credit and Security Agreement with Merrill Lynch Capital (the "ELP Credit Agreement") and (m) DPGA Management, LLC, an affiliate of ELP ("DPGA", and together with the entities referenced in subsections (a) through (l), the "Parties" and together with the entities referenced in subsections (b) through (l), the "Non-Debtor Parties") and (ii) granting certain related relief.   In support of this Motion, the Debtors respectfully state as follows:

### Preliminary Statement

By this Motion, the Debtors are seeking approval of a settlement that fully resolves the rejection of agreements under which SHP together provide management and staffing services to the Debtors, including any and all claims that may arise therefrom, together with any claims that may be asserted by their principal, Anderson and his entity CAC.  The negotiations of this settlement provided a starting point for what is now a global settlement between a number of

01:14168968.1

parties-in-interests in these cases, resolving a variety of issues and potential claims that could have delayed the Debtors' swift emergence from Chapter 11 and the proposed *Joint Chapter 11 Plan of Reorganization of Devonshire PGA Holdings, LLC and Its Subsidiaries* (the "Plan") [D.I. 14]. As further set forth below and in the terms of the Settlement Agreement, the Debtors' prepetition lender and Anderson, who prior to September 12, 2013, held the outstanding equity interests in the Debtors, were able to resolve their outstanding disputes and pending litigations— clearing the way for a reorganization process that has the support of the key parties-in-interest. As this Court will note, although the Debtors are seeking approval of the Settlement Agreement by this Motion, the Settlement Agreement is effective and binding as to each Non-Debtor Party.

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363(b) and 365(a) of the Bankruptcy Code and Bankruptcy Rules 6004, 6006 and 9019.

### Background

**A.      General Background**

3.      On September 19, 2013 (the "Petition Date"), each of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are in possession of their properties and continuing to operate their business as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

4.      The Debtors' cases (the "Chapter 11 Cases") are jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

5.      Additional information regarding the events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of Paul Rundell in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "Rundell Declaration") [D.I. 4].

**B.      Prepetition Management Contracts and Staffing Agreements**

6.      The Debtors own the Devonshire at PGA National (the "Facility"), a for-profit continuing-care retirement community located in Palm Beach Gardens, Florida.  The Facility is comprised of two components (1) an independent living facility with 327 independent living units consisting of three 4-story residential towers all connected to a central clubhouse and (2) an assisted living and skilled nursing facility with a total of 110 units (34 assisted living units and 76 skilled nursing units), a number of which are also designated as Alzheimer's/dementia care units.

7.      The Facility is operated and managed by SHP Health Care and SHP Senior Living (together, the "Management Companies") under two management agreements, one between Chatsworth at PGA and SHP Health Care and a second agreement between Devonshire at PGA and SHP Senior Living (together, the "Management Contracts").  SHP Employment, a company affiliated with the Management Companies, provides staffing and employees to the

01:14168968.1

4

Debtors pursuant to two separate Staffing Services Agreements also with Devonshire at PGA and Chatsworth at PGA (the "Staffing Agreements").[2]

8.    On the Petition Date, the Debtors filed the *Motion to Reject Management Related Executory Contracts* (the "Rejection Motion") [D.I. 11], seeking to reject the Management Contracts and the Staffing Agreements.[3]

9.    On the Petition Date, the Debtors also filed the Plan, which will be amended to incorporate and reflect the settlements contained in the Settlement Agreement and any order entered by the Court.

**C.    The Settlement Agreement**

10.    In addition to resolving the Rejection Motion and eliminating the large claims that might otherwise arise from the termination of the Management Contracts and Staffing Agreements, the Settlement Agreement reflects the terms of a global settlement between numerous parties in interest in these Chapter 11 Cases, including a number of non-Debtor parties.

11.    As set forth in greater detail in the Rundell Declaration and the Settlement Agreement, prior to the Petition Date, the Parties were engaged in a number of actions (the "Litigations") relating to the enforcement of their respective rights under the various prepetition loan documents.    Most notably, SHP Investments (an entity controlled by Anderson) commenced an action against HJSI and HJSI-II in the Superior Court of the State of Connecticut seeking to temporarily and permanently enjoin the UCC foreclosure sale of 100%

---

[2]    Copies of the Staffing Agreements were not available at the time of the filing of the Rejection Motion. Copies of the Staffing Agreements are attached hereto as Exhibit B.

[3]    As set forth in the Rejection Motion, the Debtors and their prepetition secured lender, ELP have identified a replacement manager—Erickson Living Management—to provide the services set forth in the Management Contracts and Staffing Agreements.

of the limited liability membership interest in Holdings.  The court denied SHP Investment's

application and following the foreclosure sale, HJSI-II, became the sole member of Holdings.

12.    Immediately following the filing of these Chapter 11 Cases by HJSI-II, the

Parties re-engaged in negotiations and have now reached the following settlement with respect

to the Rejection Motion and the Litigations.

13.    The terms of the Settlement Agreement are, as follows:[4]

| 1. Rejection of the Management Contracts and Staffing Agreements | Subject to Court approval, the Management Contracts and Staffing Agreements shall be rejected effective as of a date that is between forty-five (45) and ninety (90) days following the entry of an order on this Motion. |
|---|---|
| 2. Covenants of Borrower Parties[5] | • **Support**:   Each Borrower Party agrees to support the Settlement Agreement, the Plan, Disclosure Statement and any other motion or application filed by the Debtors or a Lender Party in the Chapter 11 Cases.  The Borrower Parties further agree not to take any action materially inconsistent with the Agreement, the Plan, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions.<br><br>• **Communications**:  Each Borrower Party shall not make any public announcements or communication with any person regarding the Facility or the Chapter 11 Cases without the prior written consent of Redwood or Sims.<br><br>• **Access to Books, Records, Facilities**:  Each of the Borrower Parties shall (i) make available to the Debtors prior to the effective date of the rejection of the Management Contracts, and turn over to the Debtors promptly after such date, all of the Debtors' property, and recorded information, including books, documents, records, and papers, relating to the Debtors' property or financial affairs, (ii) provide each Lender Party, including the Debtors' Chief Restructuring Officer, access to all facilities and personnel of the Facility, |

---

[4]    The terms contained herein are provided for summary purposes only, and all terms not defined herein shall be given the meanings ascribed to them in the Settlement Agreement.  To the extent of any inconsistency between this summary and the Settlement Agreement, the terms of the Settlement Agreement shall govern.

[5]    The Borrower Parties are defined as: SHP Employment, Anderson, CAC, SHP Investments, SHP Services and SHP Healthcare.

(iii) identify in writing all accounts in which any cash or cash equivalents of the Debtors is held and (iv) continue to perform their respective obligations under the Management Contracts and Staffing Agreements until the effective date of the rejection.

- **Acknowledgement of Mezzanine Foreclosure and Related Matters**: The Borrower Parties acknowledge and agree that (i) the foreclosure sale by HJSI of SHP Investments' 100% limited liability company interests in Holdings, and the admission of HJSI-II as the sole member of Holdings was (A) done in a commercially reasonable manner and (B) was valid and effective to vest in HJSI-II all right, title and interest in and to Holdings, (ii) the appointment of HJSI-II as the Manager of the Debtors following the foreclosure was valid and effective, (iii) HJSI-II shall have the right, power and authority to resolve the Litigations, (iv) HJSI-II had the right, power and authority to commence the Chapter 11 Cases, and (v) no member of the Borrower Group shall do anything to interfere with the exercise by HJSI-II of its rights as the sole member of Holdings.

- **Releases; Covenant Not to Sue**:

  o Each of the Borrower Parties, for him/itself and on behalf of their respective Representatives, members, managers, directors, officers, assigns, predecessors, successors, parents, subsidiaries, affiliates, and all other representatives, attorneys and professionals (all of the foregoing, the "Borrower Group"), agrees to remise, release and forever discharge each of the Lender Parties, Trimont, the Prior Lenders[6], Cain Brothers and their respective Representatives, members, managers, directors, officers, assigns, predecessors, successors, parents, subsidiaries, affiliates, and all other representatives, attorneys and professionals (all of the foregoing, the "Lender Group"), of and from any and all claims, actions, causes of action, suits, arbitrations, accounts, covenants, contracts, controversies, damages, judgments, and demands of whatever kind or nature, that any member of the Borrower Group ever had, now has, or may claim to have up through the execution of

---

[6]    The releases are only effective with respect to Trimont and each Prior Lender to the extent that Trimont or such Prior Lender executes a substantially equivalent release in favor of the Borrower Parties.

| | |
|---|---|
| | the Agreement, whether known or unknown and whether suspected or unsuspected, pertaining to or in any manner relating to or arising from the Mezz Loan Documents and/or the Senior Loan Documents, including, without limitation (A) the matters alleged and the claims raised in any of the Litigations and (B) all claims under all the Rejection Motion and/or the Management Contracts and Staffing Agreements. |
| | o   No member of the Borrower Group shall (A) sue or otherwise initiate any litigation, arbitration or other proceeding against any person or entity that is a beneficiary of the releases described above with respect to the matters covered by those releases; or (B) file any proofs of claim in the Chapter 11 Cases or against the Debtors, the Reorganized Debtors (as defined in the Plan) or its property, including, but not limited to, Rejection Damages Claims (as defined in the Plan). |
| 3.  Payment by Redwood of Certain Fees on behalf of the Debtors | • **Transition Period Fees**:  To the extent the Debtors do not pay the amounts that are due under the Management Contracts, Staffing Agreements and Settlement Agreement in respect of the Transition Period, Redwood shall promptly pay such fees to the Borrower Parties.<br><br>• **Prepetition Management Services**:  In consideration of the management services the Borrower Parties provided to the Debtors under the Management Contracts and Staffing Agreements prior to the Petition Date, Redwood shall pay, on behalf of the Debtors, (i) One Hundred Thousand Dollars to the Borrower Parties and (ii) to SHP Employment an amount equal to gross payroll, related taxes and 401(k) and flexible spending account funding, which are unpaid as of the Petition Date; provided however, that the foregoing clause (ii) shall only apply if the Bankruptcy Court does not enter an order permitting the Debtors to pay such amounts to SHP Employment. |
| 4.  Covenants of Lender Parties (including the Debtors)[7] | • **Settlement Payment**: Subject to the terms and conditions of the Agreement, within two (2) business days after the earliest to occur of (i) the Effective Date (as defined in the Plan), or (ii) the dismissal or conversion of one or more of the Chapter |

---

[7]         The Lender Parties are defined as: Debtors, Redwood, Sims, HJSI, HJSI-II, ELP and DPGA.

11 Cases, Redwood, on behalf of the Debtors, shall pay Anderson, on behalf of the Borrower Parties, Three Million Dollars ($3,000,000) by wire transfer of immediately available United States Dollars.

- **Releases; Covenant Not to Sue**:

  o Each of the Lender Parties (which includes each of the Debtors), for itself and on behalf of their respective Representatives, members, managers, directors, officers, assigns, predecessors, successors, parents, subsidiaries, affiliates and, as applicable, respective bankruptcy estates, and all other representatives, agrees to remise, release and forever discharge each member of the Borrower Group of and from any and all claims, actions, causes of action, suits, arbitrations, accounts, covenants, contracts, controversies, damages, judgments, and demands of whatever kind or nature, that any member of the Lender Group ever had, now has, or may claim to have up through the execution of the Agreement, whether known or unknown and whether suspected or unsuspected, pertaining to or in any manner relating to or arising from the Mezz Loan Documents and/or the Senior Loan Documents, including, without limitation: (A) the matters alleged and the claims raised in the Litigation; (B) that certain Guaranty of Non-Recourse Carve-Outs Agreement dated May 1, 2007 executed by Anderson in connection with the Senior Loan Documents; (C) that certain Guaranty of Non-Recourse Carve-Outs Agreement dated May 1, 2007 executed by Anderson in connection with the Mezz Loan Documents (together with the Guaranty described in clause (B) above, the "Guarantees"); (D) all causes of action under chapter 5 of the Bankruptcy Code; and (E) the Guarantees automatically and without any further action by any person shall terminate and be of no further force and effect.

  o No member of the Lender Group shall sue or otherwise initiate any litigation, arbitration or other proceeding against any person or entity that is a beneficiary of this the releases described above with respect to the matters covered by such releases.

| 5. Dismissal of Actions | The Parties shall work in good faith, and use their best efforts to |
| --- | --- |

| | |
|---|---|
| | cause the Litigation to be promptly dismissed with prejudice. |
| 6.  Binding Effect | Each of the Parties acknowledges and agrees that the Settlement Agreement is not effective and binding upon the Debtors other than Section 1(c) thereof (external communications, access to books and records and other transition matters) and Section 4 thereof (Bankruptcy Court approval) until approved by the Bankruptcy Court.  For the avoidance of doubt, the Agreement is effective and binding with respect to all Parties other than the Debtors immediately upon its execution, and shall remain effective and binding with respect to all such Parties even if the 9019 Order is not entered or any other approval of the Bankruptcy Court that would be necessary to make the Agreement effective and binding with respect to the Debtors is not obtained. |
| 7.  Indemnification | If the Agreement is not effective and binding upon the Debtors, Redwood agrees to indemnify and defend the members of the Borrower Group against, and hold the members of the Borrower Group harmless from and against, any and all losses, damages, liabilities, judgments, fees and expenses (including reasonable attorneys' fees) actually incurred by them as a result of any matter being asserted against them by the Debtors, any official unsecured creditors' committee, or ay chapter 7 or chapter 11 trustee that, if the Agreement had been effective and binding upon the Debtors, would have been released pursuant to the Agreement. |

## Relief Requested

14.    The Debtors respectfully request entry of an order pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 9019(a) approving the Settlement Agreement in accordance with its terms.

## Basis for Relief

**A.    The Settlement Agreement, Including the Releases Should Be Approved Pursuant To Bankruptcy Rule 9019(a)**

15.    Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

01:14168968.1

10

16.    This Court has the power, pursuant to Bankruptcy Rule 9019, to authorize the Debtors to enter into the settlement described in the Settlement Agreement.  Rule 9019(a) provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement."  The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged.  *In re Sassalos*, 160 B.R. 646, 653 (D. Or. 1993) (stating that "compromises are favored in bankruptcy, and the decision of the bankruptcy judge to approve or disapprove a compromise . . . rests in the sound discretion of the judge.").  The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." *In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414 (1986).

17.    Approval of a proposed settlement is within the "sound discretion" of the Bankruptcy Court.  *In re Neshaminy Office Building Associates*, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986). The court must determine whether the proposed settlement is in the "best interests of the estate."   *See In re Energy Cooperative, Inc.*, 886 F.2d 921, 927 (7th Cir. 1989).   In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimate[] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." *In re Penn Central Transportation Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979); *see also In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *In re*

*Louise's Inc.*, 211 B.R. 798, 801 (D. Del. 1997) (describing "the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'")).

18.     In particular, the Third Circuit Court of Appeals has enumerated four factors that should be considered in determining whether a settlement should be approved, namely: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).

19.     In deciding whether to approve a settlement, the bankruptcy court should not substitute its judgment for that of the debtor. *Neshaminy*, 62 B.R. at 803.  Nor should it decide the numerous questions of law or fact raised by litigation.  Rather, it should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); *see also In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that "the court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

20.     The resolutions embodied in the Settlement Agreement are reasonable and in the best interest of the Debtors, their estates and their creditors.  The Settlement Agreement provides for a fair and practical resolution of the Rejection Motion and potential claims arising from such rejection, as well as a number of other disputes between the Parties that could indefinitely delay these Chapter 11 Cases and ultimately derail the Debtors' proposed Plan.  Such disputed issues,

01:14168968.1

if litigated to their conclusion, would consume the Debtors and their professionals and drain the estates' resources.  Further, the Settlement Agreement was the product of significant discussions and negotiations between the Debtors, their secured lenders (ELP and HJSI-II), the Management Companies and Anderson, and the settlement embodied therein falls well above the lowest point in the range of reasonableness.  In addition, as discussed below, the applicable *Martin* factors weigh in favor of approving the Settlement Agreement.

> a.    *The Probability of Success in Litigation*

21.    As with all litigation, the probability that the Debtors will prevail in litigating the potential rejection damage claim that would be asserted by the Management Companies and SHP Employment as a result of the rejection of the Management Contracts and Staffing Agreements is uncertain.  Although the Debtors believe that they have valid defenses to any such rejection claim no litigation is assured.  Moreover, the relationship between the Debtors and their prior principal, Anderson, has been highly contentious, resulting in litigations in over three different forums immediately prior to the filing of these Chapter 11 Cases.  Absent the Settlement Agreement, any potential rejection damage claim, as well as possible claims by Anderson regarding the Debtors' authority to file these Chapter 11 Cases, would have to be litigated before this Court with no guaranties of a more favorable outcome for the Debtors.  In contrast to the uncertainty and inherent risk in litigating these matters and the unavoidable expenditures related thereto, the Settlement Agreement provides the Debtors with a resolution of any rejection damage claim at $0,[8] a smooth transition of the operations and management of the Debtors' businesses, and the release of any and all potential claims by Anderson and the SHP entities

---

[8]    As set forth in the Settlement Agreement, Redwood (an affiliate of ELP) will make a settlement payment in the amount of $3,000,000 to Anderson.

01:14168968.1

against the Debtors. This outcome is well above the lowest point in the range of reasonableness—particularly in light of the uncertainty of success through further litigation. Accordingly, the Debtors submit that the Settlement Agreement meets the first factor of the *Martin* test.

> b.      *The Likely Difficulties in Collection*

22.     The Debtors do not believe that collection of any judgment that could be obtained against Management Companies, SHP Employment and the other entities controlled by Anderson is a significant issue animating the Settlement Agreement; this factor is thus neutral.

> c.      *The Complexity of the Litigation Involved, and the Expense,*
> *Inconvenience, and Delay Necessarily Attending It*

23.     The Settlement Agreement satisfies the third factor in *Martin*'s four-factor test because failing to achieve a consensual resolution of matters being settled would add both inconvenience, expense and potential delays to these Chapter 11 Cases—effects which would be borne by both the Debtors and their creditors at large. In addition to potential litigation relating to the rejection of the Management Contracts and Staffing Agreements, a number of the Parties to the Settlement Agreement could attempt to assert claims against the Debtors and their current equity owners in an attempt to derail the reorganization process. Litigating these potential claims could be a lengthy, expensive, and burdensome process—a process which the Settlement Agreement obviates in full. Accordingly, the third factor of *Martin*'s four-factor test is satisfied and weighs in favor of the Court approving the Settlement Agreement.

> d.      *The Paramount Interest of Creditors*

24.     Entry into the Settlement Agreement serves the paramount interest of creditors of the Debtors. As noted above, resolution of the rejection damage claim, as well as potential claims held by each Non-Debtor Party provides certainty in these Chapter 11 Cases and helps to

01:14168968.1

ensure that allowed unsecured creditors are paid in full, as currently contemplated under the Plan. In addition, the Settlement Agreement reduces administrative expenses attendant to litigation of the many potential disputes resolved in the Settlement Agreement, thereby reducing the claims pool. The reduction of potential liabilities and the support of each of the Parties to the Settlement Agreement will benefit all creditors of the Debtors. Accordingly, the fourth *Martin* factor weighs in favor approving the Settlement Agreement.

> e.    Summary

25.    A review of the four factors set forth above clearly demonstrates that the Settlement Agreement is in the best interest of the Debtors and their creditors. The resolution and compromise of the disputes and issues between the Parties (including the Non-Debtor Parties) as embodied in the Settlement Agreement: (i) is fair and equitable; (ii) represents a settlement that rests well above the lowest point in the reasonable range of potential litigation outcomes; (iii) obviates the expense, delay, inconvenience, and uncertainty that would attend any litigation of the parties' issues; and (iv) advances the paramount interests of creditors. Therefore, the Settlement Agreement satisfies Bankruptcy Rule 9019 and should be approved by the Court.

**B.    The Settlement Agreement, Releases, and Termination of the Management Contracts and Staffing Agreements Should Be Approved Pursuant to Section 363(b) of the Bankruptcy Code**

26.    Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To obtain court approval of a use of property under section 363(b), a debtor needs only to show a legitimate business justification for the proposed action. *See, e.g., Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification) (internal citation omitted);

01:14168968.1

15

*Computer Sales Int'l, Inc. v. Fed. Mogul Global, Inc.* (*In re Fed. Mogul Global, Inc.*), 293 B.R. 124, 126 (D. Del. 2003) ("As applied in the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction."); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business purpose" test for use of property under section 363(b) of the Bankruptcy Code).

27.     While the Debtors believe that the settlement can and should be approved solely under the Bankruptcy Rule 9019(a) standard set forth above, the Debtors also meet the "sound business reason" standard of section 363(b) of the Bankruptcy Code with respect to the grant of releases contained in the Settlement Agreement.

28.     Here, the Debtors are receiving counter-releases from the Management Companies, SHP Employment and each of the other entities controlled by Anderson (the Debtors' prior principal) in exchange for the release of their claims.  And although the potential amount of any recoveries by any of the Parties cannot be known with certainty, the mutual releases here are roughly analogous in extent.  In fact, the Parties to the Settlement Agreement are exchanging mutual releases in regards to any potential rejection damage claim arising from the Rejection Motion, but the Debtors are additionally resolving claims stemming from the Debtors' prepetition credit agreements, the various litigations commenced prior to the Petition Date and potential challenges to the Plan and the confirmation process.  In short, the Debtors are releasing their claims against the Borrower Parties (as defined in the Settlement Agreement), but are themselves receiving substantial releases in turn.

29.     Thus, the Debtors further submit that the terms and conditions of the Settlement Agreement—including the releases contained therein, and termination of the Management

Contracts and Staffing Agreements—are reasonable and fair to all parties.  Moreover, the terms

of the Settlement Agreement are the product of arm's-length, good faith negotiations between the

Parties. Accordingly, the Debtors respectfully request that this Court approve the Settlement

Agreement and authorize the various releases embodied therein pursuant to section 363(b) of the

Bankruptcy Code.

> **C.** **The Settlement Agreement and Termination of the Management Contracts and Staffing Agreements Should Be Approved Pursuant to Section 365 of the Bankruptcy Code**

30.    The Management Agreements and Staffing Contracts are each executory

contracts.  Pursuant to Bankruptcy Code section 365 a debtor in possession's decision to assume

or reject or modify such executory contracts should be approved if it is  a reasonable exercise of

business judgment.  Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to

the court's approval, may assume or reject an executory contract or an unexpired lease."  11

U.S.C. § 365(a); *see Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1075

(3d Cir. 1992); *see also In re Penn Traffic Co.*, 524 F.3d 373 (2d Cir. 2008).  The Court may

approve a debtor's rejection of an executory contract or unexpired lease if such rejection is

made in the exercise of such debtor's sound business judgment, and if such rejection benefits its

estate. *See, e.g.*, *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (A debtor's

decision to assume or reject an executory contract will stand so long as "a reasonable business

person would make a similar decision under similar circumstances."); *In re Philadelphia

Newspapers, LLC*, 424 B.R. 178, 182 (Bankr. E.D. Pa. 2010) ("The standard applied to

determine whether the rejection of an executory contract or unexpired lease should be

authorized is the 'business judgment' standard."); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib.

Corp.*, 872 F.2d 36, 39 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco (In re Bildisco)*,

682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984); *Westbury Real Estate Ventures, Inc.*

01:14168968.1

17

*v. Bradlees, Inc. (In re Bradlees, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) ("[u]nder the business judgment test, . . . [a court should approve a debtor's proposed rejection] if the debtor can demonstrate that rejection will benefit the estate"). It is enough if a debtor determines in its business judgment that a benefit will be realized. *Sharon Steel Corp.*, 872 F.2d at 39 (citing *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)); *In re Balco Equities, Inc.*, 323 B.R. 85, 99 (Bankr. S.D.N.Y. 2005) ("In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit the estate."). The business judgment standard requires that the Court approve the debtor's business decision unless that judgment is the product of bad faith, whim or caprice. *In re Philadelphia Newspapers, LLC*, 424 BR 178, 182-83 (Bankr. E.D. Pa. 2010); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001); *Lubrizol Enter., Inc. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985) *cert. denied* 475 U.S. 1057 (1986). Here the Debtors, the Management Companies and SHP Employment have agreed to terminate the executory contracts on mutually beneficial terms that are far better for the estates than simple rejection.

31.     The Settlement Agreement eliminates a potentially substantial damage claim that could otherwise arise under the Management Agreements and Staffing Contracts. Further, simple rejection of these contracts and the immediate cessation of the services thereunder could have a negative impact on the Debtors' ability to provide uninterrupted services at its Facility. The rejection, as contemplated in the Settlement Agreement, provides for a transition period, during which the Management Companies and SHP Employment will assist in the smooth transition of management and operations to the Debtors.

01:14168968.1

18

32.     The Settlement Agreement is the product of arms' length, good faith negotiations between and among the Parties and falls well within the range of reasonableness.    For the reasons set forth above, the Settlement is in the best interests of the Debtors' estates and their creditors and warrants approval by this Court.

**Satisfaction of Bankruptcy Rules 6004(a), 6004(h) and 6006(c)**

33.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rules 6004(a) and 6006(c) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

34.     Notice of this Motion shall be provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors; (c) the Operating Debtors' Secured Lender, ELP West Palm, LLC, and its counsel; (d) Administrative Agent to ELP West Palm, LLC, TriMont Real Estate Advisors, Inc.; (e) Holdings' Mezzanine Lender, HJSI Devonshire II, LLC, and its counsel; (f) Administrative Agent to HJSI Devonshire II, LLC; (g) counsel to the Resident's Council; (h) the Florida Office of Insurance Regulation; (i) the Centers for Medicare and Medicaid Services; (j) the United States Attorney's Office for the District of Delaware; (k) the Internal Revenue Service; and (l) the Securities and Exchange Commission; (m) the Florida Agency for Health Care Administration; (n) each of the parties to the Settlement Agreement and (o) those parties who have formally filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

01:14168968.1

**WHEREFORE**, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit A: (i) granting the relief requested herein, and

(ii) granting such other relief as this Court deems just and proper.


Dated:    September 25, 2013
          Wilmington, Delaware

                                         YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                         */s/ M. Blake Cleary*
                                         M. Blake Cleary (No. 3614)
                                         Sean M. Beach (No. 4070)
                                         Robert F. Poppiti, Jr. (No. 5052)
                                         Justin P. Duda (No. 5478)
                                         Rodney Square
                                         1000 North King Street
                                         Wilmington, Delaware 19801
                                         Telephone:  (302) 571-6600
                                         Facsimile:  (302) 571-1253

                                         *Proposed Counsel to the Debtors and Debtors in
                                         Possession*

01:14168968.1